**UNITED STATES, Appellee,**

v.

**Christian GOODCHILD, Defendant, Appellant.**

**No. 94–1097.**

United States Court of Appeals, First Circuit.

Heard April 6, 1994.

Decided June 8, 1994.

---

Vincent J. D'Elia, Englewood, NJ, for defendant, appellant.

Jean B. Weld, Asst. U.S. Atty., with whom Paul M. Gagnon, U.S. Atty., Concord, NH, was on brief, for appellees.

Before: SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOWNES, Senior Circuit Judge.

Defendant-appellant, Christian Goodchild, was indicted on one count of using two unauthorized access devices, *i.e.*, two Discover credit cards issued on two separate accounts, and obtaining goods and services within a one-year period with a value in excess of $1,000, with intent to defraud, in violation of 18 U.S.C. § 1029(a)(2).[1]

After a jury trial, defendant was found guilty. She was sentenced to eleven months incarceration, a three-year term of supervised release, and ordered to pay restitution of $10,090.52 to Discover Credit Card Services, Inc. This appeal followed.

We consider the following issues:[2] (1) whether the government proved each and every element of 18 U.S.C. § 1029(a)(2) beyond a reasonable doubt; (2) whether the district court erred in admitting certain evidence; (3) whether defendant's conviction was due in part to the ineffective assistance of counsel; (4) whether the prosecutor's conduct warrants a reversal; and, (5) whether there was error in applying the sentencing guidelines.

## SUFFICIENCY OF THE EVIDENCE

Our standard of review is firmly established:

> We assess the sufficiency of the evidence as a whole, including all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial, and need not exclude every reasonable hypothesis of innocence, that is, the factfinder may decide among reasonable interpretations of the evidence.

*United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir.1991) (citations omitted). *See also United States v. Sepulveda*, 15 F.3d 1161, 1173 (1st Cir.1993); *United States v. Argencourt*, 996 F.2d 1300, 1303 (1st Cir. 1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 731, 126 L.Ed.2d 694 (1994).

■ There are four essential elements of the crime for which defendant was convicted: (1) that the two Discover credit cards specified in the indictment were "access devices" within the meaning of 18 U.S.C. § 1029(e); (2) that defendant used the credit cards without authorization during any one-year period and obtained anything of value aggregating $1,000 or more during the time period; (3) that defendant acted knowingly, willfully, and with intent to defraud; and (4) that defendant's actions affected interstate commerce. *See United States v. Ryan*, 894 F.2d 355, 356–57 (10th Cir.1990).

We now turn to the trial record. Defendant's father, Anthony Goodchild, died in an automobile accident on September 15, 1988. In January of 1988, Anthony Goodchild had applied for and received two Discover credit cards, limited solely to his use. His applica-

---

1. 18 U.S.C. § 1029(a)(2) provides:
   (a) Whoever—
   . . . . .
   (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that peri-

od; shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

. . . . .

2. Appellant has eight numbered issues in her brief. We have consolidated them to five for purposes of our review.

tion gave as his address P.O. Box 398, Bristol, New Hampshire. The 1988 credit cards expired in January 1990. Discover was not notified of Goodchild's death so it sent him two new cards, numbers 2620 and 2471, on January 8, 1990, to the same post office box address. The re-issue cards had the same restriction as the original ones—the sole use of Anthony Goodchild.

About two months after her father's death, defendant rented the same post office box her father had rented—box 398. Defendant notified the postmistress that her mother, Anne, and her father could receive mail at the post office box. Defendant's mother and father had been divorced sometime prior to her father's death.

At the time the two re-issue credit cards were mailed to post office box 398, defendant was the only one using the box. On January 16, 1990, defendant called Discover, identified herself and asked that she be sent a card on her father's credit account. No mention was made of her father's death. Discover informed her that it could not do this unless she forwarded a power of attorney authorizing her use of the credit card accounts. Defendant proceeded to make purchases with the cards limited to her father's use.

Defendant used card number 2471 twenty-two times between January 16 and February 23, 1990, to obtain things or services of value aggregating $4,847.11. She used card number 2620 thirty-five times between January 15 and April 10, 1990, to obtain things or services of value aggregating $7,137.43. Defendant made two minimum monthly payments on card number 2620, $91.00 on March 3, 1990, and $104.00 on March 19, 1990. These were the only payments she made on either of the cards.

On February 5, 1990, Discover security personnel started an investigation of the use of card number 2471 because of transactions exceeding the charge limit. After receiving no answer at the phone number it had for Anthony Goodchild, Discover deactivated the card. On February 6 an attempted use of the card at Nutri–System in Laconia, New Hampshire, was blocked.

The card account was then assigned to Discover's collections department. It attempted to locate Anthony Goodchild. The phone listed on his credit card application, 603–744–6591, was called on April 23, 1990, and a woman informed the caller that Anthony Goodchild no longer lived at that address. It learned from Anthony's former boss that he had died "three to four years ago." Discover, on July 19, 1990, again called the number it had called previously. The caller was told by the same woman who had answered the phone on April 23, that she had had the phone number for a year, that she did not know Anthony Goodchild, and that a Goodchild lived in Alexandria, New Hampshire.

Discover found a telephone number for defendant in Alexandria, New Hampshire, 603–744–0157. The number was called on July 19, 1990, and a message left on the answering machine asking that the call be returned. A woman called back. After identifying herself as Christian Goodchild, she said a number of things. She told the Discover agent that Anthony Goodchild had died in an automobile accident on September 15, 1988, in Reading, Pennsylvania. She said that there was a "long story behind the account sales" in January and February, 1990. She went on to say that her parents were divorced four months before her father's death and that after he died "girlfriends started popping up" and her mother was heartbroken. She told Discover that the attorney had paid off "all credit accounts" through the estate, that the estate was closed, and because she had fired the attorney handling the estate for incompetence, there was no attorney to contact. Defendant also volunteered that her father's latest girlfriend, who was living with him at the time of his death, was "Arline," last name and present whereabouts unknown. After this phone call, the credit card accounts were referred to the fraud unit of Discover, and eventually were turned over to United States Postal Inspectors.

There was independent evidence linking defendant to the credit card transactions. An insurance adjuster, Terry Seger, went to defendant's home on June 14, 1991, to inves-

tigate her burglary claim of a loss in excess of $70,000. Seger told defendant that he needed corroborating information of the value of the items stolen. Defendant submitted specific Discover card records of purchases on both cards totalling approximately $3,362.12. The records showed that these purchases were made in 1990. Defendant told Seger that she had lived in her father's house since a month after her father's death in 1988. She also told Seger that she owned the Discover credit cards jointly with her father.

Evidence was introduced showing that defendant was a regular customer of Nutri–System Weight Loss Centers in Concord, New Hampshire, in 1990. Purchases were made from Nutri–System on card number 2620 on February 12, February 26, and March 3, 1990, and one purchase on card number 2471 on February 1, 1990.

■ Based on our review of the record, focussed as prescribed in the light most favorable to the verdict, we find that the prosecution proved all four elements of the crime charged beyond a reasonable doubt. There can be no doubt that the Discover credit cards were "access devices" within the meaning of the statute and defendant did not challenge the judge's charge to this effect.[3] Nor can any serious challenge be made to the evidence showing use of the credit cards by defendant. And it is clear that defendant's use of the credit cards affected interstate commerce. The one issue that requires further discussion is whether the government has proven intent to defraud.

### Intent to Defraud

Under 18 U.S.C. § 1029(a)(3) the government must prove that a defendant "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices...." Section 1029(e)(3) defines "unauthorized access device" as follows:

the term "unauthorized access device" means any access device that is lost, sto-

len, *expired*, revoked, canceled, or obtained with intent to defraud;

(Emphasis added.)

The district court charged the jury as follows:

The third element that the Government must prove beyond a reasonable doubt is that the defendant acted knowingly and with intent to defraud.

The Government must prove beyond a reasonable doubt:

(1) that Christian Goodchild obtained the Discover cards with intent to defraud, or that the credit cards were lost, stolen, expired, revoked or canceled; and

(2) that she knowingly and with intent to defraud *used* the credit cards.

(Emphasis added.)

The court also gave, at defendant's request, a "good faith" instruction:

Since an essential element of the crime charged is intent to defraud, good faith on the part of a defendant is a complete defense to a charge of credit card fraud. If the defendant actually believed in good faith that she was acting properly, even if she was mistaken in that belief, and even if others were injured by her conduct, there would be no crime. An honest mistake in judgment does not rise to the level of criminal conduct. A defendant does not act in good faith if, even though she honestly holds a certain opinion or belief, that defendant also acted with the purpose of deceiving others.

While the term good faith has no precise definition, it means among other things a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another.

The burden is on the Government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt. The defendant is under no obligation to prove good faith.

---

**3.** 18 U.S.C. § 1029(e)(1) defines "access device" as follows:

the term "access device" means any card, plate, code, account number, or other means of account access that can be used, alone or in

conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);

It is clear that the jury was properly and evenhandedly instructed on intent to defraud.

■ Fraud is usually proven by circumstantial evidence. Direct proof of a knowing intent to defraud is rare. *See United States v. Nivica*, 887 F.2d 1110, 1113–15 (1st Cir. 1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). As we said in *Nivica:* "There is no pat formula for such proof; factual circumstances may signal fraudulent intent in ways as diverse as the manifestations of fraud itself." *Id.* at 1113.

■ We now examine the evidence. Defendant points to the following evidence and the reasonable inferences to be drawn therefrom as establishing that she had no intent to defraud Discover. She took out the post office box two months after her father's death in September 1988, in order to help the estate receive mail, for her personal use, and the use of her mother. Defendant points out that in using the credit cards she signed her surname as she did on other credit cards held by her. She also asserts that she always disclosed her proper name, address, phone number and driver's license number. She emphasizes that she never denied using the credit cards, and that she did make payments on the cards from her own checking account. She states that she always paid bills late. We have been unable to find any evidence about defendant paying bills late, but will assume that there is evidence to that effect or that it could be reasonably inferred from other evidence. Defendant emphasizes that during the time of the credit card charges she had been appointed personal representative of her father's estate with the consent of her mother and two brothers and that all the expenditures were made with the approval of the attorney representing the estate. Defendant also points out that she was financially able to pay the credit card bills.

We start our examination of the government's evidence on intent to defraud with the telephone call from defendant to Discover on January 16, 1990, in which she requested, without mentioning her father's death, that she be sent a card on her father's credit accounts and was told that in order to do so Discover required a power of attorney authorizing her to use the accounts. Defendant then proceeded to use both cards, which were limited to her late father's use, for credit purchases totalling $11,984.54. The only payments made on the accounts were two minimum monthly payments of $91.00 and $104.00 on card number 2620. Although she was administrator of her father's estate during the time she was using the cards, defendant never notified Discover until mid-July of 1990 that her father had been dead since September 15, 1988. When the insurance adjuster was investigating defendant's claim of a burglary of her home, she specified Discover credit card purchases of items that she claimed had been stolen. She told the insurance adjuster that she held the cards jointly with her father. This was false and defendant knew it was false. There can be no doubt that defendant had the wherewithal to pay Discover what was owed. By the spring of 1990, defendant had received distributions from her father's estate of approximately $22,855. By the time of her indictment, defendant had received $181,607 in estate distributions.[4]

We conclude that there was sufficient evidence for a jury to find beyond a reasonable doubt that defendant had obtained the credit cards after they had expired on her father's death, that she used them for her own benefit knowingly and with intent to defraud, and obtained something of value aggregating more than $1,000 during a one-year period. Or to put it another way, the government proved all the elements of the crime charged beyond a reasonable doubt.

### THE ADMISSION OF EVIDENCE

Defendant hotly contested, on the grounds of hearsay, the admission of "collection memos" of Discover which contained the histories of the two accounts used by her. The memos incorporated the substance of telephone calls purportedly made by defendant to Discover. The basis of defendant's hearsay objection to the memos was that neither the person(s) who prepared the memo(s) nor the person(s) who had the telephone conversation(s) or the

4. We can only wonder why defendant needed court appointed counsel.

person(s) who maintained the records testified. The memos were admitted under the business record exception to the hearsay rule, Fed.R.Evid. 803(6). The telephone statements allegedly made by defendant on July 19, 1990, were also admitted as an admission under Fed.R.Evid. 801(d)(2). A detailed exposition of the presentation of this evidence is necessary.

Glen Hall, manager of fraud investigations for Discover, testified as follows. The fraud investigation unit often initiated investigations based on referrals received from the collections department. Each referral contains a record of what the collections department has done on the account up to the date of the referral to the fraud unit. This information includes any contacts with and statements made by the cardholder. A referral also contains any documentation on hand, including sales drafts, with the customer's signature on them.

The main activity by the collections department on a delinquent account consists of telephone calls to locate the cardholder. It is standard procedure for collections personnel to log everything done. This is called "memoing the account." All phone calls have to be "memoed." The collections department uses its own shorthand system in the memo record. Hall testified that he was familiar with most of the shorthand system used. All of the account memos are put into a computer. Each account memo can be printed out when needed. Exhibits 12a, 12b, 12c, 13a, and 13b were computer printouts of "collection memos" pertaining to defendant's accounts. Hall explained how the printouts were read and the meaning of the shorthand terms and symbols used in them. Hall testified that the printout exhibits were brought with him in response to a subpoena for Discover's collections file. He also testified that these records were kept in the ordinary course of business and stored on Discover's computer.

■ Defendant's hearsay attack focuses on the admission of exhibits 12b and 13b. These computerized memos include references to telephone contacts with a woman at the telephone number listed on Anthony Goodchild's credit card application. This woman referred the collections caller to a person by the name of Goodchild living in Alexandria, New Hampshire. As a result, collections obtained defendant's phone number and left a message on her answering service. Defendant objected to the introduction of this evidence. The district court properly admitted the statement of the woman that a person by the name of Goodchild was living in Alexandria, not for the truth of the statement made, but to explain what Discover did in response to it.

It is not the case that all out of court statements are inadmissible as hearsay. The Federal Rules of Evidence make it quite clear that such statements are inadmissible only if offered for the truth of the matter therein. Fed.R.Evid. 801(c). We agree with the district court's decision permitting the introduction of the documents, on the ground that they were admitted, not for proving the truth of their contents, but to prove what steps were taken to investigate the circumstances surrounding the assault.

*Morgan v. Massachusetts General Hospital,* 901 F.2d 186, 190–91 (1st Cir.1990). This ruling applies with full vigor to the telephone statements made by the unidentified woman.

Defendant concentrates most of her objection fire on telephone statements allegedly made by her on July 19, 1990, in response to Discover's request on her answering service that she call. The statements were: that she identified herself as Christian Goodchild; that Anthony Goodchild had died in an automobile accident on September 15, 1988; that her parents were divorced four months prior to her father's death; that after her father died "girlfriends started popping up" and her mother was heartbroken; that the attorney paid off all "credit accounts" through the estate; that she had fired the attorney for incompetence in handling the estate and the estate was closed; that her father had a girlfriend living with him at the time of his death by the name of "Arline," last name and present whereabouts unknown.

■ The core issue is whether the computer printouts of the collection memos containing records of telephone statements made to

Discover's collection personnel were properly admitted under the business record exception to the hearsay rule. Fed.R.Evid. 803(6) provides:

(6) **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

We find that the telephone statement memos meet the strictures of the rule. They were reports or records made either during the telephone conversations or immediately following them. They were made and kept in the course of a regularly conducted business activity, *i.e.,* telephonic investigations of delinquent credit card accounts. And it was the regular practice of Discover to make a record of such telephone calls.

Although Hall did not make the records himself or participate in the telephone conversations, we think he was a witness qualified to explain the memos. He was the manager of the fraud unit of Discover and understood both the procedure followed by collections in investigating delinquent accounts and the records required to be kept of such investigations. There was no evidence indicating lack of trustworthiness of the source of the information or the circumstances of preparation.

In rendering our ruling we are, of course, aware

that the usual array of threshold questions pertaining to the admissibility of business records come within the ambit of the district court's discretion. These usual questions include, of course, questions as to whether a proper foundation was laid or whether sufficient indicia of trustworthiness were shown.

*United States v. McGill,* 953 F.2d 10, 13 (1st Cir.1992).

We are not persuaded by defendant's argument that the memos were not business records, but prepared for litigation. Records prepared by a debt collections department are primarily made to enable the department to track down debtors and collect money owed. This is not the kind of record condemned in *Palmer v. Hoffman,* 318 U.S. 109, 113–14, 63 S.Ct. 477, 480–81, 87 L.Ed. 645 (1943) which was a statement made by the engineer of a train involved in an accident. The record here was not prepared with an eye to litigation; its purpose was to facilitate the collection of debts owed Discover. The Tenth Circuit, in an analogous case, held:

The government established at trial that the notes were contemporaneous with the [telephone] conversation, were part of the regular course of the loan counselors' business, and otherwise qualified as a business record under Rule 803(6). Therefore, the district court did not abuse its discretion in ruling that the notes qualify as an exception to the hearsay rule.

*United States v. Kingston,* 971 F.2d 481, 486 (10th Cir.1992).

We find the telephone statements of defendant made on July 19 to Discover were admissible under the business record rule.

■ The district court also admitted as admissions under Fed.R.Evid. 801(d)(2)(A) [5] the July 19 telephone statements made by defendant to Discover. We recognize, of course, that normally statements by one not a party to the business are not admissible for the truth of the matter stated unless some exception other than the business records

---

5. Fed.R.Evid. 801(d)(2)(A) states:

**(d) Statements which are not hearsay.** A statement is not hearsay if—

**(2) Admission by party-opponent.** The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity....

exception is involved; the business records exception merely avoids having to call the person in the business who had the telephone conversation but does not justify admitting the statements of the outsider for their truth. In this case, the predicate for making the statements relevant is that the jury could reasonably find that the statements were made by the defendant. The evidence was that she returned a call made to her number and identified herself. She then made statements about Anthony Goodchild and his wife that only one privy to the family history would know. The statements were admissions because they could be used to identify defendant and were properly admitted as such. Moreover, the judge gave a cautionary instruction after the phone-call evidence was admitted:

> Members of the jury, during the course of this witness's testimony you have heard certain testimony about notations or memos made in the business records of Discover concerning certain phone conversations. Before you can attribute any of those recorded remarks to the defendant, Ms. Goodchild, in this case, you must be satisfied from all of the evidence before you that the defendant was in fact the person who was on the other end of the telephone line and making those remarks.
>
> If you are not satisfied from the evidence that the caller was the defendant, then you must not attribute any of those remarks to her.

This cautionary instruction was clear and correct. It advised the jury how the phone call evidence should be approached.

### INEFFECTIVE ASSISTANCE OF COUNSEL

■ Defendant mounts a lengthy and detailed argument that trial counsel's poor performance resulted, at least in part, in defendant's conviction. We follow our usual rule and refuse to address the ineffective assistance of counsel issue in the first instance. In *United States v. Mala*, 7 F.3d 1058 (1st Cir.1993) we explained in detail the reason for the rule:

> We have held with a regularity bordering on the monotonous that fact-specific

claims of ineffective assistance cannot make their debut on direct review of criminal convictions, but, rather, must originally be presented to, and acted upon by, the trial court. *See, e.g., United States v. McGill*, 952 F.2d 16, 19 (1st Cir.1991); *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992); *United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir.1989); *United States v. Costa*, 890 F.2d 480, 482–83 (1st Cir. 1989); *United States v. Hoyos–Medina*, 878 F.2d 21, 22 (1st Cir.1989); *United States v. Carter*, 815 F.2d 827, 829 (1st Cir.1987); *United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir.1983). The rule has a prudential aspect. Since claims of ineffective assistance involve a binary analysis- the defendant must show, first, that counsel's performance was constitutionally deficient and, second, that the deficient performance prejudiced the defense, *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)— such claims typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal. *See Costa*, 890 F.2d at 483; *Hoyos–Medina*, 878 F.2d at 22. In addition, the trial judge, by reason of his familiarity with the case, is usually in the best position to assess both the quality of the legal representation afforded to the defendant in the district court and the impact of any shortfall in that representation. Under ideal circumstances, the court of appeals should have the benefit of this evaluation; elsewise, the court, in effect, may be playing blindman's buff.

*Id.* at 1063 (footnote omitted). *See also United States v. Daniels*, 3 F.3d 25 (1st Cir.1993).

### PROSECUTORIAL CONDUCT

Defendant charges that the "prosecutor's unduly prejudicial and overreaching actions constitute plain error and warrant a reversal of the action." We have read the record carefully and have found no actions by the prosecutor that even suggest conduct requiring reversal. It is true that the prosecutor

pushed hard during the trial for the admission of evidence and to sustain his objections and he was somewhat highhanded at times. But this is part of the adversarial system. There was no conduct by the prosecutor that was unethical, unfair, or which infringed upon the constitutional rights of defendant.

We are, however, bothered by a statement in defendant's brief that is without support in the record. On page 32 of defendant's brief there is the following statement:

> In addition, during the prosecutor's closing his repeated use of the term "uncontradicted testimony" drew attention to the fact that Ms. Goodchild did not testify. Such references are grounds for reversal.

We agree that such a reference might well be grounds for reversal and a new trial. But the prosecutor's argument did not contain a single use of the term "uncontradicted testimony," let alone repeated use of it. We expect appellate counsel to read the trial record and represent accurately in the brief and at oral argument what is contained therein. Counsel should be aware that we read the record, as well as the briefs, carefully.

### THE SENTENCING

We are somewhat hampered in our consideration of this issue because neither party ordered a transcript of the sentencing hearing in this case. We proceed on the basis of the presentence report and the judgment which includes the court's statement of reasons for the sentence. Defendant received the following sentence: she was committed to prison for eleven months; she received a supervised release term of three years; and she was ordered to pay restitution to Discover in the amount of $10,090.52.

Her sentence was arrived at as follows. Pursuant to § 2F1.1 of the Guidelines the base offense level (B.O.L.) for a violation of 18 U.S.C. § 1029(a)(2) is six. The court found that the amount of Discover's loss was $10,090.52. This increased the B.O.L. by three levels. Because the offense involved more than minimal planning, the offense level was enhanced two more levels. No other adjustments to the B.O.L. were made. The defendant's criminal history category was I.

The imprisonment range for a B.O.L. of eleven and a criminal history category of I is eight to fourteen months.

■ Defendant's main challenge to the sentence was the court's determination that the victim's loss amounted to $10,090.52. She argues that the loss was $9,160.27. If this were the loss, under the applicable section of the Guidelines, the imprisonment range would be six to twelve months.

The presentence report shows the amount of loss as $9,160.27. The district court rejected this. In its statement of reasons it said:

> The government objected to paragraphs 10 and 11 of the addendum on the grounds that in calculating the loss to Discovery, [sic] late and finance charges should be included. If such charges are included, the loss figure is $10,090.52 rather than $9,160.27 as determined in the report. The latter figure results in an increase of two rather than three levels to the base offense level. The court concluded that during the trial Glen Hall, a representative of Discovery, [sic] testified that the loss to Discovery [sic] was $10,090.52 and that figure was not challenged during the course of the trial. Therefore, the court established the lost [sic] figure as $10,090.52 which will result in an increase in three levels to the base offense level rather than two levels as indicated in paragraph 21 of the report. Paragraph 21 is amended to reflect a three level increase.

■ Our standard of review follows two intersecting standards. Valuation of loss is reviewed under the clear error standard. *United States v. Brandon*, 17 F.3d 409, 456–57 (1st Cir.1994). But when "an appeal raises a purely legal question involving the proper interpretation of the sentencing guidelines, appellate review is plenary." *United States v. DeLuca*, 17 F.3d 6, 7 (1st Cir.1994).

The issue of "loss" valuation requires an interpretation of Commentary 7 to § 2F1.1 of the Guidelines which states in pertinent part:

> 7. Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the

money, property, or services unlawfully taken; *it does not, for example, include interest the victim could have earned on such funds had the offense not occurred.* (Emphasis ours.) The question is whether, in light of the interest preclusion statement in the commentary, the district court erred in including finance charges and late fees in its valuation of the loss.[6] There can be little doubt that the courts must follow the Guidelines commentaries. *Stinson v. United States,* — U.S. —, —, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993).

We are not the first court to grapple with the scope and application of the "interest" statement in Commentary 7. In *United States v. Henderson,* 19 F.3d 917, 928–29 (5th Cir.1994) (footnote omitted) the court held:

The current commentary to the Sentencing Guidelines provides that the amount of loss "does not, for example, include interest the victim could have earned on the funds had the offense not occurred." U.S.S.G. § 2F1.1, comment. (n.7). We find that this commentary sweeps too broadly and, if applied in this case would be inconsistent with the purpose of § 2F1.1. *Stinson v. United States,* — U.S. —, —, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). Interest should be included if, as here, the victim had a reasonable expectation of receiving interest from the transaction. *See, e.g., United States v. Lowder,* 5 F.3d 467, 471 (10th Cir.1993) (holding that interest should be included in the amount of loss where the defendant promised victims a specific interest rate on their investments); *United States v. Jones,* 933 F.2d 353, 354–55 (6th Cir.1991) (interest should be included where the defendant defrauded credit card companies which had a reasonable expectation of a specific return on the credit extended). In the words of the district judge, "interest is a loss, a loss of earnings on money—representing a loss of earnings on money that was—that rightfully belonged to the bank and therefore should be also included." 11 R. 42–43.

We find no error in the district court's decision to include interest in the amount of loss in this case.

In *United States v. Lowder,* 5 F.3d 467 (10th Cir.1993) the court reasoned:

We interpret the guideline as disallowing "opportunity cost" interest, or the time-value of money stolen from victims. Here, however, Defendant defrauded his victims by promising them a guaranteed interest rate of 12%. He induced their investment by essentially contracting for a specific rate of return. He also sent out account summaries, showing the interest accrued on their investment. This is analogous to a promise to pay on a bank loan or promissory note, in which case interest may e included in the loss.

*Id.* at 471.

In a case like this one, involving the fraudulent use of unauthorized credit cards, the Sixth Circuit, in a *per curiam* opinion held:

We do not think it was error for the district court to include the interest charges in the calculation of the loss. When Ms. Jones made her purchases with the fraudulently obtained credit cards, the issuer advanced money to the retailer on her behalf. When Ms. Jones failed to pay, the issuer lost the use of the money that ought to have come back to it. Money has a time value, as all borrowers and lenders know, and the time value of the money withheld by Ms. Jones was fixed by the credit card agreements under which the interest was calculated.

*United States v. Jones,* 933 F.2d 353, 354 (6th Cir.1991).

This is a close issue and we must acknowledge that there is to some degree a conflict between the cited cases and the language of the Commentary. The conflict is due to a clash between the ambiguous language used in the Commentary and the complexity of what constitutes "interest" and when it is an integral part of the value of the "money, property or services unlawfully taken." Commentary 7. Our holding will not solve

---

**6.** Although the court did not state explicitly that these charges were included such can be inferred from its comment in its statement of reasons that the government objected to the presentence report's recommendation of a two-level increase because such recommendation failed to include

"late and finance" charges. *See also* Government's Brief at page 41 in which it is stated:

The court accepted as accurate Hall's figures, which included only finance charges and late fees as of the dates of the termination of the accounts in 1990,....

the problem; such resolution lies with the Sentencing Commission.

We hold that in a case involving the fraudulent use of unauthorized credit cards, finance charges and late fees do not come within the meaning of the Commentary phrase "interest the victim could have earned on such funds had the offense not occurred". This phrase, we think, refers to opportunity cost interest. In a credit card case there is an agreement between the company and the cardholder to the effect that when payments are made late, or not at all, the cardholder is subject to late fees and finance charges. This is part of the price of using credit cards. The credit card company has a right to expect that such fees and charges will be paid. This is not "interest that the victim could have earned on such funds had the offense not occurred." It is a contractual obligation on which the credit card company relies each time it extends credit to a cardholder. In fact, but for the cardholder's promise to pay late fees and finance charges, the credit card company would not extend its credit in the first instance. Such charges, therefore, are properly included in the loss valuation.

*The judgment of the district court is affirmed in all respects.*