**UNITED STATES of America,**
**Plaintiff, Appellee,**

v.

**Gary S. GILBERG, Defendant, Appellant.**

**No. 95–1586.**

United States Court of Appeals,
First Circuit.

Heard Nov. 9, 1995.

Decided Jan. 31, 1996.

---

Gary C. Crossen, with whom Toni G. Wolfman, Mark D. Rosen, Cindy M. Lott and Foley, Hoag & Eliot, Boston, MA, were on brief, for appellant.

Wan J. Kim, Attorney, Department of Justice, Washington, DC, with whom Donald K. Stern, United States Attorney, Boston, MA, Mark D. Seltzer, Acting Director, New England Bank Fraud Task Force, and James P. Gillis, Washington, DC, Trial Attorney, New England Bank Fraud Task Force, were on brief, for appellee.

Before SELYA, CYR and STAHL, Circuit Judges.

CYR, Circuit Judge.

Defendant Gary S. Gilberg challenges several district court rulings relating to his trial and sentencing for conspiring to make, and making, false statements to financial institutions in order to procure mortgage loan financing, *see* 18 U.S.C. §§ 371 & 1014. We affirm all but the restitutionary sentence.

# I

## BACKGROUND

During the 1980s, after borrowing almost $5 million which he agreed to repay from future condominium sale proceeds, Gilberg launched Chancery Court, a forty-unit condominium project in Lynn, Massachusetts. Condominium sales did not proceed apace, however, and Gilberg decided to lure prospective buyers by promising to obtain 100% mortgage financing for them, obviating the need for down payments. To this end, Gilberg would inflate the purchase price stated on the sales agreement which he submitted to the bank in support of the buyer's mortgage loan application. A so-called "amended" sales agreement, containing the true purchase price, would be retained in Gilberg's private files, and the buyer was told not to mention the "amendment" to the bank. On other occasions, Gilberg provided prospective buyers with second mortgage financing, which he concealed from the first-mortgage lenders by instructing his attorney not to record the second mortgages, or to record them late. Gilberg attended each loan closing, personally signing HUD–1 settlement statements which he knew to contain false information. These means enabled Gilberg to sell thirty-seven condominium units, which were financed through various banks.

In August 1993, Gilberg was indicted in one count for conspiring to make false statements on twenty-one loan applications to three FDIC-insured financial institutions, *see* 18 U.S.C. § 371, and in thirteen counts for making false statements to FDIC-insured institutions, *see id.* § 1014. Several condominium buyers, as well as Gilberg's attorney, testified that Gilberg originated and orchestrated the scheme. The jury convicted on all counts and the district court sentenced Gilberg to thirty-six months' imprisonment and ordered $3,635,000 in restitution.

# II

## DISCUSSION

### A. The Trial Related Rulings

#### 1. "Good faith" Jury Instruction

Gilberg first contends that the final jury instruction misdefined the *mens rea* element in 18 U.S.C. § 1014, which criminalizes "*knowingly* mak[ing] any false statement or report ... *for the purpose of influencing* in any way the action of ... any [FDIC-insured bank] ... upon any application, advance, ... commitment, or loan." (Emphasis added.) Gilberg argues that section 1014 affords a "good faith" defense where the defendant knew the statement or report contained false information but acted without the "bad" purpose to influence the bank's actions. He proffered evidence that he knew and believed, at the time of the various loan applications, that the prevailing banking practice was to approve or disapprove applications based *solely* on the appraised value of the real property securing the loan, rather than on whether the real estate sale itself involved price "discounts" or secondary mortgage financing. Thus, Gilberg argues, the district

court hobbled his defense by instructing the jury that "a defendant does not act in good faith even if he honestly holds a particular opinion or belief and, yet, knowingly makes false and fraudulent statements or misrepresentations."

Gilberg concededly raised no objection to the jury instruction. *See* Fed. R.Crim.P. 51. Consequently, we review for plain error, *see* Fed.R.Crim.P. 52(b), and may reverse only if (i) the final jury instruction constituted error (ii) which was or should have been "obvious" in the sense that the governing law was clearly settled to the contrary, and (iii) appellant proves that the error resulted in "prejudice," or in other words, that it affected his substantial rights. *See United States v. Hurley*, 63 F.3d 1, 9 (1st Cir.1995) (citing *United States v. Olano*, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)). Even if these three criteria are met, however, we do not "notice the error unless it caused 'a miscarriage of justice' or [seriously] undermined 'the integrity or public reputation of judicial proceedings.'" *Id.* (citations omitted).

Though the statutory interpretation posited by Gilberg is dubious at best, *cf., e.g., United States v. Wilcox*, 919 F.2d 109, 112 (9th Cir.1990) ("The requisite intent [under § 1014] is the intent to influence an action, and nothing more."), we do not reach the merits. Gilberg cites to no authority—let alone to a controlling United States Supreme Court or First Circuit decision—clearly holding that the "good faith" instruction given below contained an erroneous statement of the *mens rea* requirement under section 1014. *See Olano*, 507 U.S. at 732–34, 113

S.Ct. at 1777 ("*At a minimum*, the Court of Appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law.") (emphasis added).[1] Hence, any error in the challenged instruction was neither "obvious," nor cognizable under Criminal Rule 52(b).

### 2. *Motion in Limine*

Gilberg next assigns error in the district court order precluding evidence that the defrauded banks had relied exclusively on property appraisals in determining whether to approve loan applications, and not on the apparent absence of "discounts" and second mortgage financing. He claims that this ruling prejudiced him because the excluded evidence would have bolstered his "good faith" defense. *See supra* Section II.A.1.[2]

Once again we review for plain error, since Gilberg first raised this claim on appeal. *See Hurley*, 63 F.3d at 9. As there was no plain error in rejecting the "good faith" defense instruction, *a fortiori* there can have been no plain error in excluding evidence offered in support. Furthermore, given Gilberg's concession that a representative sampling of this "good faith" evidence was admitted at trial, he has failed to demonstrate "prejudice." *Olano*, 507 U.S. at 1778–79, 113 S.Ct. at 1778 (noting that, unlike Rule 52(a), Rule 52(b) provides that "the *defendant* rather than the Government ... bears the burden of persuasion with respect to prejudice") (emphasis added).

### B. *The Sentencing Rulings*

#### 1. *Amount of Loss (U.S.S.G. § 2F1.1)*

Gilberg contends that the district court committed three errors in calculating

---

1. *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), are inapposite. Even if Gilberg's interpretation of the "purpose" clause in § 1014 were correct, he cannot seriously contend that the one clear *mens rea* element in § 1014—"knowingly" communicating *false* statements—does not criminalize conduct a normal person readily would recognize as culpable.

2. We do not understand Gilberg to argue that the excluded evidence was relevant to the discredited "complicity" defense, namely, that any bank officials' knowing participation in the scheme would exonerate Gilberg under § 1014. *See United*

States v. Johnson, 585 F.2d 119, 124 (5th Cir. 1978) (rejecting complicity defense, and noting that the "[t]he savings and loan's awareness of the fraud is not relevant, for its existence is not inconsistent with the intent to influence which a violator of § 1014 must possess"). Nor do we understand Gilberg to argue for the similarly discredited "lack of reliance" defense, namely, that his purpose to influence was *immaterial* because the banks did not, in the end, actually rely on his false statements in approving the loan applications. *See United States v. Norberg*, 612 F.2d 1, 4 (1st Cir.1979) (expressly rejecting such a defense).

the amount of loss under the then-applicable version of U.S.S.G. § 2F1.1, and that the combined effect of its miscalculations ballooned the total loss from $1–2 million to the $2–5 million range, which in turn led the court to make a ten-level (rather than a nine-level) upward adjustment in his base offense level of six.[3]

First, Gilberg argues that the loss calculation should not have included $726,637 in accrued mortgage loan interest. *See* U.S.S.G. § 2F1.1, comment. (n. 7) (excluding from the loss calculation the "interest the victim could have earned"); *United States v. Hoyle*, 33 F.3d 415, 419 (4th Cir.1994). But the settled law in this circuit is to the contrary. *See United States v. Goodchild*, 25 F.3d 55, 65–66 (1st Cir.1994) (holding that accrued finance charges on credit cards are not lost "opportunity costs," and may be included in amount of loss) (citing *United States v. Lowder*, 5 F.3d 467, 471 (10th Cir. 1993)). Gilberg's attempt to distinguish *Goodchild* is unavailing. As the *Goodchild* panel's citation to *Lowder* and other authority makes clear, we have found no principled difference between interest earned on a credit card (a/k/a "finance charges") and interest earned on other types of loans. *See Hurley*, 63 F.3d at 9 (noting that newly-constituted panels are bound by a prior panel decision on point). Since it was proper to include the $726,637 in interest as part of the loss, the other loss calculation errors raised on appeal need not be addressed because the unimpeachable loss totalled no less than $2,669,065, well within the $2–5 million range necessary to trigger a ten-level upward adjustment.

### 2. *The "Role in Offense" Enhancement*

■■ Gilberg challenges the four-level upward adjustment based on his role in the offense, *see* U.S.S.G. § 3B1.1, contending that the government improperly singled him out for prosecution by cutting deals with the real "leaders" of the Chancery Court scheme—his attorney and a business part-

ner. Second, he complains that the district court failed to make express findings of fact regarding the *comparative responsibilities* of the participants in the scheme. We review for "clear error," *see United States v. Akitoye*, 923 F.2d 221, 227 (1st Cir.1991), mindful that "battles over a defendant's [role in the offense] . . . will almost always be won or lost in the district court," *United States v. Graciani*, 61 F.3d 70, 75 (1st Cir.1995). Gilberg's case is no exception.

■■ Gilberg concedes that the evidence could support a rational inference that he orchestrated the criminal conduct alleged in the indictment. The evidence disclosed that he was a sophisticated real estate developer who supplied false purchase prices to his attorney, instructed his attorney and prospective buyers to conceal his false statements, and secreted the documentation containing the actual terms. Gilberg cites no authority—nor is there any—for the proposition that a sentencing court must *compare* the responsibilities of all participants before imposing a U.S.S.G. § 3B1.1 enhancement against a defendant. Moreover, in crediting the evidence that Gilberg played the pivotal role in the initial success of the Chancery Court scheme, the district court implicitly found that Gilberg was an "organizer," regardless of the precise roles played by each cohort. *See* U.S.S.G. § 3B1.1, comment. (n. 4) (noting that an offense may involve "more than one person who qualifies as a leader or organizer"); *United States v. Tejada–Beltran*, 50 F.3d 105, 111–13 (1st Cir.1995) ("We hold that retention of control over other participants, although sometimes relevant to an inquiry into the status of a putative organizer, is not an essential attribute of organizer status."); *cf.* U.S.S.G. § 3B1.1, comment. (n. 2) (authorizing upward departure for "management responsibility over the property, assets, or activities of a criminal organization," even though defendant neither led nor supervised any other participant).

---

**3.** Although normally a loss determination under U.S.S.G. § 2F1.1 is fact-based and subject to clear error review, *see United States v. Goodchild*, 25 F.3d 55, 64 (1st Cir.1994), Gilberg challenges the district court's interpretation of a sentencing

guideline. Therefore, review is *de novo. See id.; see also United States v. Ovalle–Marquez*, 36 F.3d 212, 221 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1322, 131 L.Ed.2d 202 (1995).

### 3. *The Victim and Witness Protection Act*

Finally, Gilberg claims that the restitutionary sentence overstates victim loss because the class of "victims" is too broad. He points out that the sentencing court ordered restitution in connection with all thirty-one loans, whereas the indictment charged him in relation to only twenty-one loans.

The government concedes that the last criminal conduct involving Gilberg took place no later than June 1990. The Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663–3664 (1990), governs restitution in criminal cases. *See, e.g., United States v. DeSalvo,* 41 F.3d 505, 511 (9th Cir.1994). In June 1990, the VWPA provided that the district court—in sentencing "a defendant *convicted of an offense*"—may order "restitution to any *victim of such offense.*" 18 U.S.C. § 3579(a)(1) (1982) (emphasis added); *see* 18 U.S.C. §§ 3579–3780 (1987), *amended by* 18 U.S.C. §§ 3663–3664 (1990). In *Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), the defendant had been charged, in multiple counts, with theft and unauthorized use of credit cards, offenses which caused victim losses totaling $90,431. Although Hughey pled guilty to but one count of unauthorized use of a *single* credit card, which caused $10,412 in victim loss, *id.* at 414, 110 S.Ct. at 1981, the district court ordered $90,431 in restitution. Reversing, the Supreme Court held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution *only* for the loss caused by the *specific conduct* that is the *basis of the offense of conviction.*" *Id.* at 413, 422 n. 5, 110 S.Ct. at 1981, 1985 n. 5.

Effective November 29, 1990, Congress broadened the VWPA definition of "victim," *see* Pub.L. No. 101–647, § 2509, 104 Stat. 4789, 4863, 4931 (Nov. 29, 1990) (Crime Control Act of 1990) (codified at 18 U.S.C. § 3663(a)(2)), thereby effectively overruling *Hughey* in part. Section 3663(a)(2) now provides that "a victim of an offense that involves as an element a scheme, a *conspiracy,* or a pattern of criminal activity means *any person* directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2) (emphasis added). *See generally United States v. Neal,* 36 F.3d 1190, 1200 (1st Cir.1994).

The district court ordered Gilberg to make restitution to banks *other than* the three *FDIC-insured* banks involved in the twenty-one insured loans which formed the entire basis for the conspiracy and the substantive counts upon which Gilberg was convicted. The parties agree that, under the *1987* version of the VWPA as interpreted in *Hughey,* the restitution order imposed on Gilberg would be improper, and that "approximately $2 million" would be the maximum permissible "victim loss" calculation.

The government nonetheless contends that the district court order complies with the *1990* VWPA. *See Hughey,* 495 U.S. at 413 n. 1, 110 S.Ct. at 1979 n. 1 (normally, the VWPA version in effect at *sentencing* controls). Gilberg responds that such a retroactive application of section 3663(a)(2) to his pre-November 1990 criminal conduct would violate the *Ex Post Facto* Clause, U.S. Const. art. I, § 9, cl. 3. *See Miller v. Florida,* 482 U.S. 423, 430–31, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987); *see also United States v. Newman,* 49 F.3d 1, 10–11 (1st Cir.1995); *United States v. Cronin,* 990 F.2d 663, 666 (1st Cir.1993).

Normally, we review restitution orders only for "abuse of discretion." *See United States v. Benjamin,* 30 F.3d 196, 198 (1st Cir.1994); *United States v. Savoie,* 985 F.2d 612, 617 (1st Cir.1993). Although a timely challenge to a retroactive application of the *1990* VWPA amendments would present a question of law subject to plenary review, *see, e.g., United States v. Guthrie,* 64 F.3d 1510, 1514 (10th Cir.1995); *DeSalvo,* 41 F.3d at 511; *United States v. Meacham,* 27 F.3d 214, 218 (6th Cir.1994), Gilberg concedes that he did not object at sentencing. Accordingly, we review only for plain error. *See United States v. Tutiven,* 40 F.3d 1, 7–8 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1391, 131 L.Ed.2d 243 (1995); *United States v. Rodriguez,* 938 F.2d 319, 321 (1st Cir.1991). As the Rule 52(b) "plain error" test announced in *Olano,* 507 U.S. at 730–37, 113 S.Ct. at 1776–79, applies to sen-

tencing errors, *see Benjamin*, 30 F.3d at 197; *supra* Section II.A.1, we apply the *Olano* "plain error" criteria to the forfeited "victim loss" calculation claim asserted by Gilberg on appeal.[4]

### a) *"Error"*

The first *Olano* criterion—that there be "error," *Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777—is readily met here. Retroactive application of VWPA § 3663(a)(2) would violate the *Ex Post Facto* Clause, since it would "make[ ] more burdensome the *punishment for [Gilberg's] crime[s], after [their] commission ....*" *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977) (emphasis added); *see also United States v. Johnson*, 952 F.2d 565, 585 (1st Cir.1991), *cert. denied*, 506 U.S. 816, 113 S.Ct. 58, 121 L.Ed.2d 27 (1992). As an order of restitution is part of the criminal sentence, we reject the suggestion that the November 1990 VWPA amendments may be applied against Gilberg. *See, e.g., United States v. Jewett*, 978 F.2d 248, 252–53 (6th Cir.1992) (rejecting retroactivity argument); *see also United States v. Elliott*, 62 F.3d 1304, 1313–14 (11th Cir.1995) (same); *DeSalvo*, 41 F.3d at 515 (same).

### b) *Obviousness of Error*

The government argues that retroactive application of the 1990 VWPA amendments would not constitute "obvious" error, *see Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777, because this court had yet to weigh in on the retroactivity question *by the time Gilberg was sentenced*, and other courts of appeals were divided. *Compare Jewett*, 978 F.2d at 252–53, *with United States v. Rice*, 954 F.2d 40 (2d Cir.1992); *United States v. Arnold*, 947 F.2d 1236 (5th Cir.1991) (per curiam). We disagree.

The *Rice* and *Arnold* cases are factually and legally inapposite to the present context. The retroactivity issue in *Rice* ultimately turned on a *different* 1990 VWPA amend-

ment—*not* implicated in our case—which provided that "[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a *plea agreement.*" 18 U.S.C. § 3663(a)(3) (emphasis added). The plea agreement in *Rice* expressly provided for restitution both to victims of the dismissed counts and victims of uncharged criminal conduct, *Rice*, 954 F.2d at 41–42, and the plea predated *both* the *1990 VWPA* amendments *and Hughey*. Thus, settled Second Circuit precedent supported the expansive victim loss calculation agreed to by Rice. *Id.* at 44. The Second Circuit rejected Rice's *ex post facto* argument because (1) Rice *must* have relied on the more onerous Second Circuit case law, rather than on *Hughey*, when he agreed to the broad restitution commitment adopted in the plea agreement; and (2) section 3663(a)(3) did *not* retroactively "enhance the punishment for an offense" but "merely provided that a specified type of plea agreement could be enforced from that point on." *Id.*

The Fifth Circuit employed the same analysis in *Arnold*, 947 F.2d at 1238 n. 2, noting that section 3663(a)(3) was not retroactive but "applied prospectively to validate Arnold's [earlier] plea agreement." The government cites no apposite circuit court authority holding that section *3663(a)(2)* applies retroactively to pre-November 1990 criminal conduct.

As the government correctly notes, we have yet to address this precise question. In *Cronin*, 990 F.2d at 663, the government did not contend that section 3663(a)(2) should be applied retroactively to *pre-November 1990* conduct, urging instead that *Hughey* is *distinguishable* from cases involving convictions for "offense[s]"—like *mail fraud*—which require, as an essential element, proof of a broader "scheme to defraud." *See id.* at 666; *see also, e.g.*, 18 U.S.C. § 1341. Given the inherent breadth of the "offense" of conviction in *Cronin*, the government argued that VWPA restitution was not limited to losses caused by the *particular mailings* designat-

---

4. Given the concession by the government that application of *Hughey* would result in a $1.6 million reduction in the restitution order, we conclude that Gilberg has shouldered his burden on the third *Olano* factor—"prejudice." *See su-*

*pra* Section II.A.1. We therefore confine our "plain error" analysis to the three remaining *Olano* factors (i.e., error, "obviousness," and "manifest miscarriage of justice").

ed in the individual counts upon which the defendant was convicted, but included all victim losses occasioned by the larger fraud "scheme." Noting a circuit split on the issue, we sided with the majority rule, and concluded that *Hughey* barred the broader restitution order. *Cronin*, 990 F.2d at 666; *see also Newman*, 49 F.3d at 11 (applying *Cronin* pronouncement to wire fraud conviction).

The implicit concessions of nonretroactivity in *Cronin* and *Newman* apparently stemmed from the government's acknowledgement that retroactive application of · section 3663(a)(2) would have had no colorable basis in the decisional law construing the *Ex Post Facto* Clause. *See id.* at 11 n. 14 (noting that, "[a]s the offenses occurred in 1989 and early 1990, Newman is subject to the restitution statute as it stood prior to amendment in November of 1990"). Further, had this court been satisfied that the 1990 VWPA amendments were readily amenable to retroactive application in *Cronin* and *Newman*, we could have affirmed those restitutionary sentences on that alternative ground. *See United States v. Alzanki*, 54 F.3d 994, 1008 (1st Cir.1995), *petition for cert. filed*, 64 U.S.L.W. 3298 (U.S. Oct. 16, 1995) (No. 95–619) (appellate court may affirm district court on any ground supported by record); *cf. also Jewett*, 978 F.2d at 252 (finding that *Hughey* precluded broad restitution order, before addressing VWPA retroactivity question, even though the latter issue had not been addressed by parties). Based on the clear language of the 1987 VWPA and the unanimous circuit precedents rejecting the government's retroactivity claim, *see supra* Section II. B.3.a, we hold that the error in this case satisfied the "obviousness" test announced in *Olano*. [5] *See United States v. Weiner*, 3 F.3d

17, 24 n. 5 (1st Cir.1993) (noting that a circuit split may rule out a finding that forfeited error was "obvious," even if First Circuit has not weighed in on issue).

### c) *"Miscarriage of Justice"*

■ Although *Olano* entrusts remediation of plain error to the sound discretion of the reviewing court, the courts of appeals "should not" exercise their discretion unless a forfeited error results in " 'a miscarriage of justice,' or " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Olano*, 507 U.S. at 730–32, 113 S.Ct. at 1776 (citations omitted).

■ In all events, the VWPA expressly limits restitutionary relief to *"victims* of [the] offense [of conviction]." 18 U.S.C. § 3662(a)(1) (emphasis added). A federal court has no inherent authority to order restitution in a criminal case; it may do so only as expressly provided by statute. *DeSalvo*, 41 F.3d at 511. We have noted that when the district court fundamentally departs from "obvious" sentencing principles, "the situation corresponds *mutatis mutandis* to one in which a forfeited error may have caused the conviction of an *innocent person,* the other rubric under which a plain and prejudicial error should be noticed on appeal." *United States v. Whiting*, 28 F.3d 1296, 1312 (1st Cir.) (citing *Olano*, at 736–37, 113 S.Ct. at 1779) (emphasis added), *cert. denied*, —— U.S. ——, 115 S.Ct. 378, 130 L.Ed.2d 328 (1994). Given the particular circumstances of this case, and the substantial $1.6 million reduction in restitution portended by *Hughey*'s application, we find plain error warranting vacatur of the restitutionary sentence in this case.[6] The restitution award is re-

---

**5.** It is noteworthy that the *Olano* Court explicitly reserved decision on whether an error that becomes clear after trial, but prior to review by the court of appeals, may be considered *"obvious." Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777. ("At a minimum, the Court of Appeals cannot correct an error pursuant to Rule 52(b) unless the error is obvious under current law."). As in *Olano*, we need not resolve this question because we have found, given the unanimous case law, that it was already "obvious" at the time of *sentencing* that Gilberg should not be held responsible under the 1987 VWPA for losses occasioned victims of offenses with which he was not charged, nor held retroactively responsible under

the 1990 VWPA amendments. *See supra* Section II.B.3(a), (b).

**6.** Gilberg's remaining challenges to the restitution order do not meet the "plain error" standard. First, he argues that the district court erroneously assessed the loss occasioned the lenders by using the price the lender *received* on resale following foreclosure, rather than the foreclosure price *bid* by the lender. This issue has not yet been addressed in the First Circuit. The circuit court decisions cited by Gilberg are inapposite, simply holding that the sentencing court should be wary of basing restitution on the resale

duced to $2,107,406.00, comprising the total estimated loss on the twenty-one mortgage loans designated in the indictment.[7]

*The sentence is modified to require restitution in the amount of $2,107,406. The district court judgment is affirmed, as modified.*

price where the lender acquired real estate at foreclosure but does not resell for years. *See, e.g., United States v. Holley,* 23 F.3d 902, 914 (5th Cir.1994) (six years). Here, however, there is no evidence that Gilberg's victims held the property for such extended periods following foreclosure. Consequently, any error in the victim loss calculation, or the standard employed, has not been shown to be "obvious."

Second, Gilberg contends that the district court failed to make explicit findings on his ability to pay restitution. *See* 18 U.S.C. § 3664(a). Nevertheless, we have held that such findings need not be explicit. *See Newman,* 49 F.3d at 10 (citing *Savoie,* 985 F.2d at 618). Moreover, the district court supportably found that Gilberg's earning potential would enable him to meet his considerable restitutionary obligations in the future. *Id.* at 10–11.

7. Since loss calculations under U.S.S.G. § 2F1.1 are based on criteria different from the VWPA victim loss criteria, *see, e.g., id.* § 2B1.3 (providing that "relevant conduct," for guideline sentencing purposes, may encompass conduct not charged in indictment, and conduct underlying the counts upon which defendant was acquitted), the reduction in Gilberg's restitutionary sentence requires no readjustment in the offense level. *See supra* Section II.B.1.