RYAN, Circuit Judge.
 

 Defendant George W. Jewett, Jr. pleaded guilty to two counts of mail fraud and aiding and abetting, 18 U.S.C. §§ 1341, 2, committed in the course of a bid-rigging scheme to defraud the Ford Motor Company. As part of his sentence, Jewett was ordered to pay restitution in the amount of $665,677, the entire amount allegedly lost by Ford as the result of his fraudulent scheme. We are asked to determine whether the district court exceeded its authority to order restitution under the Victim Witness and Protection Act (VWPA or Act), 18 U.S.C. §§ 3663-64.
 
 [1]
 

 I.
 

 Jewett was employed as a consultant to Arc Rubber, Inc., a manufacturer of extruded and molded rubber products. In a nine-count mail fraud indictment, the gov
 
 *250
 
 ernment alleged that Jewett and the president of Arc Rubber, codefendant Robert W. Johnson, Sr., secured Ford business through kickbacks paid to Ludwig A. Schafer, a Ford employee who “steered Ford business to Arc Rubber, Inc. by selecting which suppliers were invited to bid on Ford jobs and by rigging the bids.” The indictment stated, and Jewett admitted before the district court, that between February 1984 and March 1989, Arc Rubber issued checks for approximately $650,000 payable to Interglobal Consultants, a business name assumed by Schafer to receive kickbacks.
 

 Jewett agreed to plead guilty to Counts I and II of the indictment in exchange for the government’s promise to dismiss all other charges. Count I sets forth fully Jewett’s fraudulent scheme and refers specifically to a Ford check payable to Arc Rubber in the amount of $44,924, which Jewett, for the purpose of executing his scheme to defraud, knowingly caused to be mailed on or about March 25, 1987. Count II incorporates by reference the description of the scheme to defraud established in Count I and refers to another Ford check, in the amount of $24,054.60, mailed by Ford to Arc Rubber on or about May 21, 1987. The Rule 11 plea agreement was signed on December 4, 1990 and filed on December 7, 1990. Jewett entered his guilty plea to Counts I and II before the district court on December 10, 1990.
 

 At sentencing on February 27, 1991, the district court ordered Jewett to pay $665,-677 in restitution pursuant to the provisions of the VWPA. Jewett filed a motion to correct sentence, Fed.R.Crim.P. 35(a), asserting that restitution should have been limited to a maximum of $68,978.60, the amount of the checks specified in the two counts to which he offered his guilty plea. He appeals the district court’s denial of his Rule 35 motion.
 

 II.
 

 Jewett challenges the legality of the sentence imposed under the VWPA. We review this question of law
 
 de novo. E.g., United States v. Snider,
 
 957 F.2d 703, 705 (9th Cir.1992).
 

 III.
 

 In pertinent part, the Victim Witness and Protection Act provides:
 

 The court, when sentencing a defendant convicted of an offense under this title ... may order, in addition to or ... in lieu of any other penalty authorized by law, that the defendant make restitution to any victim of such offense.
 

 18 U.S.C. § 3663(a)(1) (1988).
 

 Jewett argues that the amount of restitution ordered was impermissible under the terms of the VWPA and in light of the Supreme Court’s interpretation of the Act in
 
 Hughey v. United States,
 
 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). In
 
 Hughey,
 
 the Supreme Court examined questions concerning the scope of restitution authorized by the VWPA in a factual situation similar to this case. An indictment charged Hughey with three counts of theft by a postal service employee and three counts of unauthorized use of credit cards. He entered a plea of guilty to Count IV, charging unauthorized credit card use, in exchange for the dismissal of all other charges arising from the scheme alleged in the indictment. Count VI alleged that “on or about October 18, 1985, ... [Hughey] did knowingly and with intent to defraud use an unauthorized [MBank Mastercard credit card] issued to Hershey Godfrey ... [to] obtain things of value aggregating more than $1,000____”
 
 Id.
 
 at 413-14, 110 S.Ct. at 1981. Hughey was ordered to pay restitution of $90,431, the total of MBank’s losses relating to Hu-ghey’s alleged theft and use of 21 credit cards issued by MBank to various cardholders, even though MBank lost only $10,412 as the-result of Hughey’s unauthorized use of the Godfrey credit card. At issue in
 
 Hughey
 
 was whether the VWPA “allowfs] a court to order a defendant who is charged with multiple offenses but who is convicted of only one offense to make restitution for losses related to the other alleged offenses.”
 
 Id.
 
 at 412-13,110 S.Ct. at 1981. Following an examination of the
 
 *251
 
 statutory language, the Court held that the Act “authorize[s] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction.”.
 
 Id.
 
 at 413, 110 S.Ct. at 1981. Because “the restitution order encompassed losses stemming from alleged fraudulent uses of cards issued to persons other than Godfrey,” the Court ruled that such portions of the order were invalid.
 
 Id.
 
 at 422, 110 S.Ct. at 1986.
 

 Jewett asserts that in light of
 
 Hughey,
 
 the scope of restitution authorized by the YWPA was limited to the losses caused by the two mailings specified in Counts I and II. His position is supported by
 
 United States v. Stone,
 
 948 F.2d 700, 704 (11th Cir.1991) and
 
 United States v. Sharp,
 
 941 F.2d 811, 815 (9th Cir.1991).
 

 The government responds, that, unlike the credit card fraud conviction at issue in
 
 Hughey,
 
 the offense of mail fraud requires proof of the existence of a scheme to defraud as an essential element of the crime,
 
 [2]
 
 and that restitution is not, therefore, limited to the losses caused by the particular mailings for which defendant was convicted, but extends to all losses attributable to defendant’s fraudulent scheme. According to the government, because the existence of a fraudulent scheme is necessary to commit mail fraud and the scheme was described in the counts to which Jewett pleaded guilty, all losses resulting from the scheme are caused by “conduct underlying the offense of conviction,”
 
 Hughey,
 
 495 U.S. at 420, 110 S.Ct. at 1984, and may be included in a restitution order. This position was adopted in
 
 United States v. Bennett,
 
 943 F.2d 738, 740 (7th Cir.1991),
 
 cert. denied,
 
 — U.S.-, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992). The government stresses that Jewett’s scheme to defraud Ford was described in the indictment and included in the counts of conviction, and that the full extent of the losses caused by the scheme was also listed, and admitted by defendant in offering his guilty plea.
 

 The district court accepted the government’s arguments and denied the motion to correct sentence, holding that because the indictment included a specific description of the entire fraudulent scheme in paragraphs one through three of Count!, and by reference in paragraph one of Count II, the court was “of the belief that the defendant pled guilty to that period of time [February 1984 to March 1989] also by pleading guilty to Count I.” The district court concluded:
 

 [in] this particular case the Court doesn’t believe
 
 [Hughey
 
 is] applicable because of the nature [of the indictment] — the way it was drafted, and because ..-. what he pled guilty to was Count I, which specifically mentions the higher amount; and, therefore, the Court will deny the motion.
 

 We disagree with the district court’s application of law. We believe, as stated well by the court in
 
 Sharp,
 
 that the fact that an offense requires, as an essential element, the existence of a scheme to defraud “is too fine a point on which to distinguish Hughey____” 941 F.2d at 815. In this case, we believe the “specific conduct that is the basis of the offense of conviction,”
 
 Hughey,
 
 495 U.S. at 413, 110 S.Ct. at 1981, can only reasonably refer to the two mailings which serve as the bases for Jewett’s convictions, and that the losses attributable to the particular mailings specified in Count I and II “establish[] the outer limits of [the] restitution order.”
 
 Id.
 
 at 420, 110 S.Ct. at 1984.
 

 The government’s argument that to limit restitution to the losses stemming from the particular mailings specified in Counts I and II would unduly confine restitution' to addressing a single element of the offense of conviction — the use of the mails — to the exclusion of the other — the existence of a fraudulent scheme advanced by the mailing — is misguided. The offense of mail fraud describes the use of the mails for the purpose of executing a scheme to defraud,
 
 Pereira v. United States,
 
 347 U.S.
 
 *252
 
 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954), and it is that specific conduct, and the losses caused by it, that establishes the scope of the district court’s authority in ordering restitution under the VWPA. Acts other thaii the particular mailing described in a count of conviction, even when committed during the course of or in furtherance of the same fraudulent scheme, do not state independent “offenses of conviction.” A restitution order encompassing losses attributable to these acts is, therefore, beyond the scope of a sentencing court’s authority to order restitution to “any victim of [an] offense.” 18 U.S.C. § 3663(a)(1).
 

 The “specific conduct” for which defendant Jewett was convicted was mail fraud, not executing a fraudulent scheme. The existence of a scheme to defraud Ford of over $650,000 does not, and cannot, alter the statutory command that restitution under the VWPA be limited to “victim[s] of [the] offense” of conviction. In this case, the offenses of conviction were the two uses of the mails in. .the execution of a scheme to defraud Ford. The district court, in ordering restitution based on all losses caused by defendant Jewett’s scheme to defraud rather than those attributable to the specific mailings for which Jewett was charged and convicted in Counts I and II, exceeded its statutory authority under 18 U.S.C. § 3663(a)(1).
 
 [3]
 

 IV.
 

 Although not addressed by the parties, another matter merits our attention. As part of the Crime Control Act of 1990, Congress amended certain provisions of the VWPA.
 
 See
 
 Pub.L. No. 101-647, § 2509, 104 Stat. 4789, 4863 (1990). In pertinent part, the VWPA now provides:
 

 For the purposes .of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant’s criminal conduct in the course of the scheme, conspiracy, or pattern.
 

 18 U.S.C.A. § 3663(a)(2) (Supp.1992). This amended subsection expands the definition of a “victim” in cases such as mail fraud, and, if applicable, would appear to authorize restitution in this case for all losses attributable to Jewett’s scheme to defraud Ford.
 
 See United States v. Brothers,
 
 955 F.2d 493, 496-97 (7th Cir.),
 
 cert. denied,
 
 — U.S. —, 113 S.Ct. 142, 121 L.Ed.2d 142 (1992).
 

 The amendments to the VWPA became effective November 29, 1990,
 
 see Stone,
 
 948 F.2d at 702 n. 3, prior to either the plea agreement (December 7, 1990) or sentencing (February 27, 1991) in this case. There appear no references to the 1990 amendments to the VWPA in the transcripts of the proceedings before the district court, perhaps due to the proximity in time between the amendments and the judgment and sentencing in this case. The Act’s provisions in effect at the time of sentencing control, however.
 
 See Hughey,
 
 495 U.S. at 413 n. 1, 110 S.Ct. at 1981 n. 1. It therefore might be possible to affirm the district court’s restitution order based on 18 U.S.C. § 3663(a)(2). We must examine, however, whether retroactive application of this provision, under the facts of this case, would violate the constitutional prohibition of
 
 ex post facto
 
 laws. U.S. Const. art. I, § 9, cl. 3.
 
 [4]
 
 We believe it would.
 

 The Supreme Court has summarized the characteristics of an
 
 ex post facto
 
 law:
 

 “It is settled ... that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense avail
 
 *253
 
 able according to law at the time when the act was committed, is prohibited as ex post facto.”
 

 Dobbert v. Florida,
 
 432 U.S. 282, 292, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) (quoting
 
 Beazell v. Ohio,
 
 269 U.S. 167, 169-70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925)). We interpret the amended section 3663(a)(2) as a change in law, superseding the Supreme Court’s decision in
 
 Hughey,
 
 adopting a broader definition of “victim,” and expanding the scope of restitution which may be ordered for offenses involving “as an element a scheme, a conspiracy, or a pattern of criminal activity____” Because the amended 18 U.S.C. § 3663(a)(2) took effect
 
 after
 
 defendant Jewett committed the mail fraud offenses for which he was convicted, and
 
 increased
 
 the applicable penalties for those crimes, it constitutes an
 
 ex post facto
 
 law, as applied to the facts of this case. Retroactive application of this specific provision is thus constitutionally prohibited, and although the new law was effective at the time of Jewett’s guilty plea and sentencing, it cannot be legally enforced against him for acts committed prior to November 29, 1990.
 
 [5]
 

 For this reason, we also hold that the statement in the Rule 11 agreement that “[t]he defendant acknowledges that this agreement does not limit the court’s authority to order him to pay restitution to any victim(s) of his offense(s)” cannot serve as a basis for affirming the district court under the other 1990 amendment to the VWPA, 18 U.S.C. § 3663(a)(3). This subsection provides that “[t]he court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement.” 18 U.S.C.A. § 3663(a)(3) (Supp.1992). Although Jewett agreed to pay restitution to any “victim(s)” of his offenses, it would be possible to order restitution for all losses caused by Jewett’s scheme only by incorporating the definition supplied in the amended 18 U.S.C. § 3663(a)(2) (“victim ... means any person directly harmed by the defendant’s criminal conduct in the course of the scheme, conspiracy, or pattern.”). Because we hold that retroactive application of section 3663(a)(2) is prohibited as
 
 ex post facto,
 
 its definition of “victim” cannot be incorporated into the Rule 11 agreement in this case. We do not, however, address the question of whether section 3663(a)(3), beyond the specific context of this case, may be applied retroactively.
 
 Compare United States v. Rice,
 
 954 F.2d 40, 44 (2d Cir.1992) (no
 
 ex post facto
 
 problem)
 
 and United States v. Arnold,
 
 947 F.2d 1236, 1237 n. 1 (5th Cir. 1991) (same)
 
 with Snider,
 
 957 F.2d at 706 n. 2 (retroactive application would violate
 
 ex post facto
 
 clause).
 

 V.
 

 The district court’s authority to order restitution in this case was limited to those losses attributable to the- specific mail fraud offenses to which Jewett pleaded guilty and did not extend to all losses suffered as the result of the underlying fraudulent scheme.
 
 [6]
 
 The restitution component
 
 *254
 
 of the sentence is therefore VACATED, and this case REMANDED for resentenc-ing.
 

 [1]
 

 . The VWPA was originally codified as 18 U.S.C. §§ 3579-80. It was redesignated as 18 U.S.C. §§ 3663-64 as part of the Sentencing Reform Act of 1984, effective November 1, 1987.
 

 [2]
 

 . There are two elements required to establish the offense of mail fraud, 18 U.S.C. § 1341: 1) a scheme to defraud; and 2) use of the mails for the purpose of executing the scheme.
 
 Pereira v. United. States,
 
 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954);
 
 United States v. Schilling,
 
 561 F.2d 659, 661 (6th Cir.1977).
 

 [3]
 

 . Our interpretation of
 
 Hughey
 
 is consistent with
 
 United States v. Gravatt,
 
 951 F.2d 350 (6th Cir.1991) (unpublished disposition), where this court limited restitution in mail and wire fraud cases "to the $96,000 accounted for by the specific transactions described in the indictment” and for which defendant was convicted.
 

 [4]
 

 . The only appellate court to have raised the issue of retroactive application of 18 U.S.C. § 3663(a)(2) explicitly pretermitted consideration of this constitutional question.
 
 See United States v. Arnold,
 
 947 F.2d 1236, 1238 n. 2 (5th Cir.1991).
 

 [5]
 

 . We believe that a resort to the legislative history, although unnecessary to our determination of the
 
 ex post facto
 
 question, supports our conclusion. A House Report on the Crime Control Act of 1990 listed the amended 18 U.S.C. § 3663(a)(2) in a portion of the report analyzing "provisions that
 
 enhance existing criminal penalties
 
 and that establish new crimes.” H.Rep. No. 681(1), 101st Cong., 2d Sess. 177,
 
 reprinted in
 
 1990 U.S.C.C.A.N. 6472, 6583 (emphasis added).
 

 [6]
 

 . Although we hold that the district court lacked authority to order restitution for all losses allegedly caused by the scheme underlying the offenses for which Jewett was convicted, we do not believe that the limits of restitution in this case are simply, or necessarily, defined by the $68,978.60 listed on the checks specified in the counts of conviction. Rather, because the checks described in Counts I and II were apparently mailed by Ford to Arc Rubber in exchange for useful products, it appears to us that an accounting of the value of the product received may be in order. As we see it, the total losses suffered by Ford as the result of the bid-rigging scheme, although' difficult to áscertain precisely, would roughly equal the amount of the kickbacks paid by Arc Rubber, which were apparently included in the calculation of the company’s bids, and some measure of the difference between Ford’s costs for the parts bought from Arc Rubber and the amount Ford would have paid for the parts had the pertinent supply contracts been subject to competitive bidding. The losses caused by the specific mailings that serve as the basis for the counts of conviction Would be some portion, but not all, of the total amount lost by Ford. At this point, however, we have
 
 *254
 
 no basis, or. warrant, to make a determination as to the precise losses suffered as the result of the mailings described in Counts I and II.