**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael DAVIS (96–5895) and Miles Jones (96–5905), Defendants– Appellants.**

**Nos. 96–5895, 96–5905.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1998.

Decided March 22, 1999.

John P. MacCoon, Asst. U.S. Attorney (briefed), Office of the U.S. Attorney, Chattanooga, TN, Chris M. Couillou (argued and briefed), Cindy Liebes (briefed), Federal Trade Commission, Atlanta, GA, for Plaintiff–Appellee.

Charles G. Wright, Jr. (argued and briefed), Chattanooga, TN, for Michael Davis.

Perry H. Piper (argued and briefed), Chattanooga, TN, for Miles Jones.

Miles Jones (briefed), pro se.

Before: NORRIS and CLAY, Circuit Judges; BORMAN, District Judge.*

---

* The Honorable Paul D. Borman, United States District Judge for the Eastern District of Michigan, sitting by designation.

## OPINION

BORMAN, District Judge.

Defendants Michael Davis (Davis) and Miles Jones (Jones) were convicted by a jury of multiple counts of wire fraud, 18 U.S.C. § 1343. The district court departed upward in sentencing both defendants. Davis was sentenced to incarceration for 108 months, Jones was sentenced to incarceration for 57 months.

Defendants appeal both from their trial convictions and their sentences. For the reasons set forth, hereafter, this Court AFFIRMS the convictions of Davis and Jones, AFFIRMS the sentence of Davis, but REVERSES the sentence of Jones and REMANDS for his resentencing.

### I.

Defendants Davis and Jones were employed as telemarketers at various times in 1993–95 at International Health, Inc., in Chattanooga, Tennessee. Davis was a "reloader," who solicited individuals who had previously sent in money to the company. Testimony of Rachel Phillips, Joint Appendix (J.A.) at 422. Jones was a "no saler," who solicited people who had said "no" to a prior solicitor. *Id.*

Davis and Jones were charged, along with four co-defendants, in a superseding indictment dated November 28, 1995, with multiple counts of telemarketing fraud under the wire fraud statute, 18 U.S.C. § 1343. The four co-defendants pled guilty. Davis and Jones exercised their constitutional right to a jury trial, and were convicted on April 9, 1996; Davis: Counts 24, 26–40 and 85–86; Jones: Counts 41–48 and 87–88. While the district court did not depart from the guidelines in sentencing the four plea-convicted co-defendants (Thor Andrews, Cory Kohlhoff, Robert Reed and Lisa Vala), it did impose significant upward departures in sentencing both Davis and Jones.

Davis' presentence report had placed him in "a total offense level of 21 and a criminal history category of I, the guideline range for imprisonment is 37–46 months." J.A. at 118. The district court departed upward eight levels to create a sentencing range of 87–108 months, and sentenced Davis at the top of that range—108 months imprisonment; 60 months on certain counts (counts 24, 26–33), plus 48 months consecutive on other counts (counts 34–40, 85–86).[1]

Jones was placed in a total offense level of 17 and a criminal history category of III, creating a sentencing range of 30–37 months. The district court departed upward four levels, creating a sentencing range of 46–57 months, and then sentenced Jones at the top of that range—57 months imprisonment.

### II.

Defendant Davis raises four issues for review:

Did the district court err in:

(1) "refusing to grant a mistrial?"

(2) "considering losses calculated in relation to alleged offenses, which were not before the court, as relevant conduct for calculating offense level?"

(3) "granting an upper [sic] departure in sentencing?"

(4) "refusing to consider that the 'victims' received some value for their expenditures in calculation of sentencing?"

Def.-Appellant Davis Br. at 3.

### A. Refusal to Grant Defendant Davis a Mistrial

Davis contends that the district court erred in refusing to grant his Motion for

---

1. The district court was required to utilize consecutive sentencing in order to impose the 108 month sentence on Davis, since the maximum imprisonment for wire fraud under 18 U.S.C. § 1343 was five years (60 months). The district court did not sentence under 18 U.S.C. §§ 2325–27, which apply only to offenses occurring after September 13, 1994. Specifically, Title 18 U.S.C. § 2326, at the time of sentencing, provided for enhanced penalties for persons convicted of an offense under, *inter alia,* § 1343:

(2) in the case of an offense under any of these sections that—
(A) victimized ten or more persons over the age of 55; or
(B) targeted persons over the age of 55,
may be imprisoned for a term of up to 10 years in addition to any term of imprisonment imposed under any of those sections, respectively.

Mistrial which he "grounded on the fact that the defendants in the trial had contradictory defenses." Def.-Appellant Davis Br. at 34. Specifically, Davis maintains that his trial defense "was based upon his subjective good faith and belief that the International Health Company was operating legally and honestly." *Id.* Davis further asserts that, although co-defendant Jones "presented no case and did not choose to testify himself," Jones' counsel "was [now] conceding the illegality of International Health," while arguing that Jones subjectively thought that during the time of his employment that the company was legitimate. *Id.* at 34–35.

Davis' counsel cites to Rule 14 of the Federal Rules of Criminal Procedure as support for his argument to reverse the conviction. That Rule states in part: "In ruling on a motion by a defendant for severance....". Defendant, however, did not file a pretrial motion for severance as required under Rule 12(b) of the Federal Rules of Criminal Procedure: "The following [motions] must be raised prior to trial: ... (5) requests for a severance of charges or defendants under Rule 14."

■ Even if Defendant Davis had been unaware, prior to trial, that there would have been grounds for a severance, he became aware of Jones' theory at the time of Jones' opening statement, as set forth on page 35 of Def.-Appellant Davis' Brief. Yet, Davis failed to move for a severance at that time as well. Instead, Davis waited to raise this issue until the conclusion of the case, when he made his motion for severance in the form of a motion for a mistrial. However, even if Davis had raised the issue timely, this Court would refuse to find an abuse of discretion in the district court's denial of Davis' motion for a mistrial.

■ The trial court's decision to deny a motion for severance is reviewed under the abuse of discretion standard. *See Zafiro v. United States,* 506 U.S. 534, 541, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). Both the Supreme Court, *Zafiro,* 506 U.S. at 537, 113 S.Ct. 933, and the Sixth Circuit, *United States v. Cobleigh,* 75 F.3d 242, 247 (6th Cir.1996), have indicated a preference for joint trials of defendants indicted together.

The Supreme Court stated in *Zafiro, id.:* "There is a preference in the federal system for joint trials of defendants who are indicted together." The Supreme Court further noted:

> Mutually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.

*Id.* at 538–39.

In the instant case, there was no "stretch" in joining defendants Davis and Jones in a single indictment; they had worked together as telemarketers at International Health, and the charges against them would be proved, in significant part, by the same evidence of the common scheme during the same time period.

While Davis may well have preferred a trial without co-Defendant Jones, the joinder did not unfairly prejudice him. Defendant Davis concedes that Jones did not testify against him, and indeed Jones presented no evidence at the joint trial. Thus, the only basis for Davis' argument for severance was contained in the opening and closing argument of Jones' counsel. That argument was not evidence, and thus there was no evidentiary basis to support Davis' Motion for Severance.

Accordingly, this Court concludes that Defendant Davis has not established an abuse of discretion by the district court in denying his Motion for Mistrial/Severance.

**B. Calculation of Defendant Davis' Sentencing Offense Level**

■ The district judge added eleven points to Davis' base offense level under United States Sentencing Guidelines (U.S.S.G.) § 2F1.1(b)(1)(L), finding that the loss to the telemarketing victims was greater than $800,000. The district judge included not only the $376,643 loss to the International Health victims, but also $519,458 of losses from Davis' prior telemarketing involvement with Wave Crest, and $114,990 of losses from his prior involvement with Fortune.

Defendant Davis objected to the district court's inclusion of the Wave Crest and Fortune loss amounts. Evidence regarding these activities was presented at the sentencing hearing through the testimony of an IRS Criminal Investigation Division Agent, based upon her prior conversation with an FBI Special Agent in California. Defendant Davis contends that there "is no exception in the Federal Rules of Evidence for the admittance of hearsay in sentencing hearings." Def.-Appellant Davis Br. at 38. This Court rejects that contention. Hearsay evidence is admissible in guideline sentencing hearings. Federal Rule of Evidence § 1101 states in subsection (d)(3) that the rules of evidence do not apply in sentencing proceedings.

In *United States v. Brown*, 147 F.3d 477 (6th Cir.1998), *cert. denied* ―― U.S. ――, 119 S.Ct. 270, 142 L.Ed.2d 223 (1998), this Court upheld the inclusion in relevant conduct for sentencing purposes, of sales for defendant Brown's work "from the previous companies where he worked." *Brown*, 147 F.3d at 485. This Court reasoned that these sales were admissible: "Brown worked at several telemarketing agencies, including his own, that had the same *modus operandi* and purpose." *Id.* This Court explained that the applicable relevant conduct sentencing guideline, U.S.S.G. § 1B1.3(a)(2), provides for the inclusion of offenses that are " 'substantially connected to each other by at least one common factor, such as ... similar *modus operandi.*' " *Id.* (quoting U.S.S.G. § 1B1.3(a)(2) commentary, applc. note 9(A)). Such a similar *modus operandi* occurred here with regard to Davis' prior telemarketing at Fortune and Wave Crest.

A recent decision of this Court, *United States v. Koeberlein*, 161 F.3d 946 (6th Cir. 1998), supports the district court's inclusion of the Wave Crest and Fortune amounts as part of Davis' relevant conduct. In *Koeberlein*, the defendant pled guilty to a single count involving theft of equipment valued at $7532.79. At sentencing, the district court applied a loss total of $168,195.15—more than 20 times the $7,532.08 plea count loss—based upon the defendant's prior equipment thefts from different victims in different states over a multi-year period. This Court in *Koeber-*

*lein* upheld the district court's utilization of that enhanced loss total, based upon this Court's discussion of relevant conduct in *United States v. Hill*, 79 F.3d 1477 (6th Cir.); *cert. denied*, 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996). The *Koeberlein* decision noted:

> We discussed relevant conduct in some detail in *United States v. Hill*, 79 F.3d 1477 (6th Cir.), *cert. denied*, 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996):
>
>> To qualify as part of a "common scheme or plan" under the "relevant conduct" guideline, the offenses "must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" U.S.S.G. § 1B1.3, application note 9(A). If offenses do not qualify as part of a common scheme or plan, offenses are nonetheless considered the "same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, application note 9(B). The three factors relevant to determining whether offenses are sufficiently related to constitute the "same course of conduct" include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* .... Furthermore, the "nature of the offenses" may also be considered to the extent pertinent to the court's analysis of the three factors. *Id.* (citing as an example the failure to file a tax return for three consecutive years because such returns are only required at yearly intervals).

*Koeberlein*, 161 F.3d at 950 (quoting *Hill*, 79 F.3d at 1481–82). In the instant case, this Court concludes that the Wave Crest and Fortune losses attributable to Davis' prior telemarketing activities were properly included as relevant conduct since the evidence before the district court at the sentencing hearing established a similar *modus operandi*, and an ongoing series of similar offenses.

## C. Upward Sentencing Departure for Defendant Davis

■ Davis argues that the district court erred in imposing an eight level upward departure from offense level 21 to offense level 29, which more than doubled the initial guideline sentencing range of 37–46 months to 87–108 months, and then imposing a sentence of 108 months.

■ This Court recognizes that the Supreme Court in *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), held that guideline sentencing includes a component of discretion for the district court judge:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. We do not understand it to have been the Congressional purpose to withdraw all sentencing discretion from the United States District Judge.

*Koon,* 518 U.S. at 113, 116 S.Ct. 2035. At the same time, as this Court recognized in *United States v. Crouse,* 145 F.3d 786 (6th Cir.1998), *Koon* does not give the district court *carte blanche* in determining a sentence; the Sentencing Guidelines must be utilized.

In the instant case, this Court concludes that the factual circumstances of Davis' extremely demeaning conduct toward his victims were sufficiently unusual to justify the upward departure. More specifically, we cannot conclude that the district court's upward departure, when measured by a standard of reasonableness, was excessive.

The district court, in sentencing Defendant Davis, stated:

> His conduct by badgering and insulting and degrading these people was, this Court finds, extreme and itself warrants an upward departure under Section 5K2.8 of the sentencing guidelines.

J.A. at 608. The record supports the district court's conclusion that, under § 5K2.8 "Extreme Conduct", Mr. Davis' conduct was extremely cruel and degrading to his telemarketing victims. Davis' trial testimony confirms his cruel and degrading conduct:

> Q. ASS'T U.S. ATTORNEY TO DEFENDANT DAVIS: Did you hear Ms. Mance crying during that tape recording?
>
> A. Yes.
>
> . . . .
>
> Q. And you told this woman while she was crying to you that you didn't want to hear the sob story of every single nickel that she had ever spent, didn't you?
>
> A. That's correct.

J.A. at 319–20.[2]

The testimony of Rachel Lynn Phillips, a co-worker at International Health, depicted Mr. Davis' manner of telemarketing:

> . . . .
>
> Mance: I said I am sorry because I, you know well that's, I can't help it. I can't do anything about it sir.
>
> Miller: Well there's something you could do about it.
>
> Mance: What tell, tell me what to do because I don't know?
>
> Miller: Well dear if we can approve this thing for the sixteen hundred dollars.
>
> Mance: If I could come up with it I would but I don't know how? (crying)
>
> Miller: Well you could take your credit card down and get a cash advance on that.
>
> Mance: Sir that's what . . .
>
> Miller: Or you could go to the bank and you could sign for a loan.
>
> Mance: That's what I'm trying to tell you.
>
> Miller: Money out of your savings.
>
> . . . .

---

**2.** A more complete depiction of Davis' conversation with Ms. Lynn Mance included the following (Davis used the pseudonym Michael Miller):

> Mance: No, that's what I'm try to tell you. I have no money. I don't have any.
>
> Miller: I'd say number one you better drop that tone with me.
>
> Mance: No I don't mean it that way. I'm just trying to say I don't, I really.
>
> Miller: I don't appreciate you just playing along like this.
>
> Mance: I am not playing along sir. You can come and look I mean.
>
> Miller: Okay.
>
> Mance: I'm, I'm willing to put up my finances to you sir.
>
> Miller: Seven thousand three hundred dollars.
>
> Mance: I understand.
>
> Miller: There's not going to be any discounts.
>
> Mance: I understand sir what your saying honestly.

Q. ASS'T U.S. ATTORNEY: What was his style like in dealing with customers on the phone?

A. He was loud, rude, obnoxious, controlling.

Q. Can you give me some examples of how he was rude?

A. Telling people they were senile and asking them what they had between their ears.

Q. Did you ever hear him call anybody stupid?

A. Yeah.

Q. Did you ever hear him make anybody cry?

A. Yes.

J.A. at 434–35.

In the instant case, although there was no serious physical injury, there was intentional infliction of psychic injury. This Court agrees with the district court that Davis' degrading conduct takes this case from the "heartland" of telemarketing cases, and supports a significant upward departure.[3]

Mance: That's what I'm trying to tell you sir. I don't have ... a savings account anymore. I don't, my credit cards are maxed.
Miller: Lynn, one thousand six hundred dollars or seventy three dollars. It's up to you.
Mance: I hear what you're saying. I wish I could do it.
Miller: Well you better start listening to what I'm saying.
Mance: I don't know how to come up with it really. I really truly don't.
Miller: How much too much is that?
Mance: Well, when you get down realistically, by the time I pay like up (crying) excuse me. Just like they sent me a shut off notice for my electric. Okay? I came up with that. All right so I'm okay there. I sent I sent that yesterday. All right? My cards are maxed out. I'm not kidding..
Miller: Well, I'll tell you what Lynn.
Mance: I'm not kidding you. Now wait.
Miller: I don't wanna sound like a hard nose.
Mance: I know you have to do what you have to do.
Miller: I need the whole sob story of every single nickel you ever spent.
J.A. at 776–79.

3. Defendant Michael Davis' recorded telemarketing conversation with customer Lloyd Davis, included the following:

In our unpublished decision, *United States v. Riordan*, 85 F.3d 629 (Table), 1996 WL 233988 (6th Cir.1996), we upheld a six-level upward departure in a telemarketing case arising from the instant district court. At the sentencing hearing in the instant case, both the government and the district court relied upon *Riordan* as the basis for an upward departure in the instant case:

[Gov't:] We have in this case all of the same factors that were present in the Riordan case. This case is virtually identical to the Riordan case....

J.A. at 603–604.

The Court: It's incumbent upon this Court to say why and to what extent there should be an upward departure in this case. This case as has been pointed out here is very similar to that of John Riordan.

J.A. at 606. Further, the district court's Order of Judgment for Defendant Davis provided, *inter alia*, the following reason for departing from the guideline range:

This case is similar to that of *U.S. v. John Riordan*, 85 F.3d 629, 1996 WL 233988 (6th Cir.1996) which upheld upward departure.... [4]

Defendant Davis: Now this is Lloyd Davis, right?
L. Davis: Yes.
Defendant: Well Lloyd, are you senile?
L. Davis: Huh?
Defendant: Are you senile?
L. Davis: Am I what?
Defendant: Senile?
L. Davis: I don't know what you mean.
Defendant: Well you know, uh, Alzheimers, do you have, are you, are you senile?
L. Davis: Well, uh I don't reckon, up (laughs)
Defendant: Lloyd do you need someone to come in and ... and you know help you with your reading and writing and all that?
L. Davis: No.
J.A. at 749–50.

4. The complete reasons for departure set forth by the district court in Defendant Davis' Judgment were:

This case is similar to that of *U.S. v. John Riordan*, 85 F.3d 629, 1996 WL 233988 (6th Cir.1996) which upheld departure. The two level enhancement under U.S.S.G. 2F1.1(b)(2)(B) for a scheme to defraud more than one victim fails to adequately take into account this case where there was at least 87 victims. The number of victims is an aggravating circumstance not adequately considered by the Sentencing Commission. 18 U.S.C. section 3553(b).

Riordan received a significant upward departure of six levels: his conduct included speaking to his targets in vulgar terms. In the instant case, Davis' conduct toward his targets was extremely cruel.

The record establishes that Defendant Davis' conduct inflicted extensive psychic injury on his telemarketing victims. This Court does not find an abuse of discretion in the district court's decision to depart upward eight levels in sentencing Defendant Davis. The upward departure was not unreasonable, given the facts of this case.

### D. Consideration of "Value" Received by Defendant Davis' Victims

■ Davis contends that the district court erred "in refusing to consider that the 'victims' received some value for their expenditures in calculation of sentencing." Def.-Appellant Davis Br. at 3.

While many of the victims received some items, it was not what they had ordered. The items, not based upon the wishes of the victims, were "extras" or "gimmes," part of the scheme to "hook" the victims. Accordingly, we conclude that these items did not provide any value measurable under the guidelines to reduce Davis' loss-calculation. An unpublished decision of this Court, *United States v. Davis*, 74 F.3d 1241 (Table), 1996 WL 15622 (6th Cir.1996) (unpublished), supports this conclusion:

> [E]very expenditure by the defendants—even those that temporarily benefitted a recipient—was an integral part of their ongoing, fraudulent scheme. Furthermore, it is doubtful whether any "customer" would value the junk that the defendants actually shipped.

*Id.* at *4.

Accordingly, this Court concludes that the district court did not err in refusing to find measurable value in the "extras" or "gimmes."

> Further, the monetary loss caused by the defendant does not fully capture the psychological [sic] and this harm done by the defendant to older people.
> The public is in need of special protection from the defendant.

### III.

Defendant Jones raises three issues for review:

1. Whether the district court erred in allowing the government to introduce into evidence a tape recorded conversation between Jones and one of his customers, Mrs. Laura Christian.

2. Whether the district court erred in ordering restitution for losses related to conduct not charged in the indictment, and for which Jones had not been convicted.

3. Whether the district court erred in departing upward from the applicable sentencing guideline range to impose a 57 month sentence.

### A. Introduction of Defendant Jones' Tape Recorded Conversation

Defendant Jones objected, pre-trial, to the admission of the audiotape recording of his telemarketing conversation with Mrs. Laura Christian. The government was unable to secure Mrs. Christian as a trial witness because of a recent hip fracture. The government rejected defense counsel's suggestion of a videotape deposition for introduction at trial. The district court admitted the tape recording at trial over Defendant Jones' objection on grounds of hearsay evidence. The district court's ruling adopted the government's argument that the taped conversation was not offered to prove the truth of the matter asserted. J.A. at 556.

Defendant acknowledges that the taped conversation

> could have been admitted if it had not been offered to prove what Mr. Jones had said to M[r]s. Christian. For example, if the government were offering the tape just to prove that Mr. Jones had a conversation with Mrs. Christian ... [or] if the government had offered the tape to prove that Mr. Jones had worked at International Health....

J.A. at 136–37. The district court used the identical language in co-Defendant Jones' Judgment, except for substituting "98 victims" for "87 victims." J.A. at 153–54.

Def.-Appellant Jones Br. at 17. Defendant maintains, however, that the tape recording was offered for the truth of the matter contained therein, and was therefore "classic hearsay." *Id.* at 18.

Defendant further contends that the harm from the admission of this conversation was that it "did not take place in a vacuum, but rather occurred in the course of a number of other conversations which Mr. Jones and other telemarketers had with Mrs. Christian," that were not before the jury. *Id.*

Finally, Defendant argues that the erroneous admission of the recording was not harmless, because the government relied upon this taped conversation, beginning with its opening statement and thereafter throughout the trial.

This Court notes that the jury was not misled, by the introduction of the tape-recording, into thinking that this was the only conversation between Defendant Jones and Mrs. Christian. The recorded conversation clearly indicates that it was one of multiple conversations between them:

Christian: You or Lisa talked to me about that

. . . .

Christian: Well I talked to you last week.

. . . .

Jones: [T]he reason I had Mr. Hollingsworth call you . . .

. . . .

Jones: Well dear, I'm going to have Mr. Hollingsworth call you right back and go ahead and verify everything . . .

. . . .

Jones: You already sent us a check for a thousand dollars.

Def.-Appellant Jones Br. at 9–13.

■ This Court need not determine whether the taped conversation was introduced for the truth of the matter asserted, because it was admissible on two other independent grounds: (1) Fed.R.Evid. 803(6), record of regularly conducted activity of International Health, since it was "kept in the course of a regularly conducted business ac-

tivity;" and (2) Fed.R.Evid. 801(d)(2), admission by Defendant Jones, a party-opponent.

Testimony at trial established that International Health had utilized a monitoring process which randomly tape-recorded sales conversations of its telemarketers, and further, that Defendant Jones was aware of that tape recording process. The testimony of Reynolds Beardsley, a consultant to International Health, established the existence of the monitoring process:

Q. Are you aware of the monitoring process?

A. Yes, sir. That was done in the office where I was at. I couldn't help but be aware of it.

. . . .

A. All I know they had somebody listen to the sales pitches in the sales office and I don't know anything else other than that.

J.A. at 257–258. The testimony of Donald Mahan, owner of International Health, confirmed the existence of the monitoring process:

Q. . . . . Can you tell us, did you have monitoring?

A. We had a monitor that worked for the company, yes, which I guess is more or less our internal police department for the company.

J.A. at 363. Finally, the testimony of Rachel Phillips, a former employee at International Health, confirmed that Jones was aware of the monitoring process:

Q. Did you ever see the Defendant Jones in the monitor's office?

A. Yes.

J.A. at 446.

At the mid-trial hearing on the admission of the Jones–Christian tape, the government established that the audiotape was made by the International Health monitor, and was seized at International Health's office during the execution of a search warrant. J.A. at 550–552.

This Court concludes that the above facts clearly establish that the tape of Jones' conversation with Ms. Christian was admissible under both Fed.R.Evid. 803(6), and 801(d)(2),

respectively. The tape was admissible under Fed.R.Evid. 803(6) because it was made and kept by International Health in the course of its regularly conducted business activity, Jones was aware of this monitoring process, and, to further establish its trustworthiness, this tape was seized from International Health. In addition, the taped conversation was admissible under Fed.R.Evid. 801(d)(2)(A) as Defendant Jones' statement.

## B. The Order of Restitution Against Defendant Jones

■ Jones asserts that the district court's Judgment order of restitution of $91,235.67 is erroneous, J.A. at 147. Jones contends that restitution must be limited to the loss attributable to the victims of the counts for which he was found guilty, to wit, $7,940.05.

The presentence report stated in paragraph 32, Victim Impact:

> Jones was indicted for charges involving ten victims during the course of his offense. The loss to these ten victims equals $7,940.05.

J.A. at 76. The presentence report subsequently stated in paragraph 97, dealing with statutory provisions relating to restitution:

> Pursuant to 18 U.S.C. § 3663, restitution may be ordered in this case. Restitution in the amount of $91,235.67 is outstanding. . . .

J.A. at 85. The restitution ordered in this case applied to losses of all of the victims of Defendant Jones' telemarketing at International Health.

In support of his argument limiting restitution, Defendant cited to the Supreme Court decision in *Hughey v. United States,* 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), which held:

> The language and structure of the [Victim Witness and Protection] Act (VWPA) make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis for the offense of conviction.

*Id.* at 413. *Hughey* is no longer controlling because of subsequent legislation redefining the conduct relevant to the reach of an award of restitution. A post-*Hughey* decision of the Sixth Circuit, *United States v. Jewett,* 978 F.2d 248 (6th Cir.1992), notes that all losses resulting from a mail fraud scheme may be included in the restitution order. *Jewett* relied upon an amendment to 18 U.S.C. § 3663(a)(2), that became effective prior to the instant scheme:

> For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly bound by the defendant's criminal conduct in the course of the scheme conspiracy, or pattern. 18 U.S.C.A. § 3663(a)(2) (Supp. 1992). This amended subsection expands the definition of a "victim" in cases such as mail fraud. . . .

*Id.* at 253.

In *United States v. Woodruff,* 142 F.3d 438 (Table), 1998 WL 96559 (6th Cir.1998), (unpublished opinion), this Court relied upon *Jewett* in upholding a district court's order of restitution for the entire scheme—not just the counts of conviction. This Court, following the *Jewett* analysis and the *Woodruff* holding, concludes that Defendant Jones' fraudulent scheme at International Health supports the district court's order of restitution that includes all those victimized by Jones in the course of this scheme to defraud.

## C. The Upward Sentencing Departure for Defendant Jones

■ Defendant Jones challenges the upward departure from the sentencing guidelines imposed by the district court to create a 57 month sentence. Defendant contends that because only he and Defendant Davis exercised their constitutional right to a jury trial, and since they were the only co-defendants who received upward sentencing departures, this *ipso facto* impels the conclusion that the district court retaliated against them for going to trial. This Court concludes that the evidence before us does not support this contention of retaliation. Nevertheless, this Court concludes that, given the evidence before the district court at the sentencing hearing, it was unreasonable for the district court

to depart upward four levels in sentencing Jones.

 With regard to Defendant Jones allegation that the district court imposed a more severe sentence because he exercised his Sixth Amendment right to a jury trial, this Court recognizes that a district court cannot retaliate against an individual who has exercised the right to trial by jury. At the same time, this Court recognizes that a defendant can receive a lesser sentence for choosing to plead guilty. "[W]e have repeatedly held that the government may encourage a guilty plea by offering substantial benefits in return for the plea; *Corbitt v. New Jersey*, 439 U.S. 212, 219, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978)" *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 807, 130 L.Ed.2d 697 (1995).

Sentencing Guideline § 3E1.1 recognizes the benefit to the justice system from the acceptance of responsibility by providing for up to a three level reduction in the offense level for a guilty-pleading defendant. No Sentencing Guideline authorizes the increase of an offense level or an upward departure when a defendant exercises the constitutional right to trial by jury.

Defendant contends that the district court determined that Mr. Jones was only different from co-defendant Michael Davis and from a previous telemarketer, John Riordan, in that this defendant on the surface was "nice" to his victims. Def.-Appellant Jones Br. at 23. The facts demonstrate otherwise. The district court also noted at the sentencing, *inter alia*, that Defendant Jones had also defrauded 99 victims, and that the monetary loss did not fully capture that harm to that large number of victims. J.A. at 641.

A similar Sixth Amendment right to trial claim was alleged against the instant district court in *Brown*. This Court rejected that claim:

With respect to Brown's claim that his sentence was enhanced because he chose to go to trial, there is simply no evidence in the record to support that claim. See, e.g., *United States v. Frost*, 914 F.2d 756, 774 (6th Cir.1990) (rejecting a similar claim because nothing in the record supported the defendants' claims).[5] However, there is ample evidence that Brown engaged in fraudulent telemarketing schemes for eight years, took leads with him to each new location, repeatedly victimized the same individuals, and took pride in being the top "reloader" at each fraudulent telemarketing location.... There is nothing in the record that indicates that the district court considered Brown's decision to go to trial in fashioning Brown's sentence.

*Brown*, 147 F.3d at 488.

The following language was employed by the instant district court at the sentencing hearing in discussing why a case that proceeds to trial may justify a more severe sentence than one in which the defendant pleads guilty:

I think one of the things that's at work here is when these cases go to trial a lot more is learned about what these individuals are actually doing, so in the case of Mr. Jones here, I have actually heard tapes of his telephone conversations and I have actually seen his victims live. And I think that a departure, that the Court is able to conclude should be given in this case, is not punishing him for going to trial, but what it is is a just sentence based upon what this Court has seen and heard personally in this case. And these other people who have pled and who have cooperated with the government at least appear to be to this Court people who have admitted their guilt and said that they were wrong and who have given some indication that

---

5. In *United States v. Frost, supra*, yet another case involving the instant district court, the appellants had asserted

that the district court abused its discretion by imposing prison sentences which are too lengthy. They argue[d] that the disparity in the prison sentences of the four individuals involved, Frost, Griffin, Watson and Haunt, necessarily leads to the conclusion that Frost

and Griffin "were punished for exercising [their] constitutional right to a jury trial." *Frost*, 914 F.2d at 773 (second alteration supplied). This Court rejected the claim, concluding that "[m]any factors may be considered in sentencing and nothing indicates that the district court considered an improper factor such as defendants' exercise of their constitutional right to a trial." *Id.* at 774.

they're not going to go out and try this tomorrow. I cannot say that about Mr. Jones or Mr. Davis.

J.A. at 642 (emphasis added).

This language reflects the obvious reality that arises when an individual proceeds to trial—that compelling evidence may come out that supports an upward departure. This Court concludes that the evidence presented by Defendant Jones does not establish that the district court imposed an upward departure based upon Jones' proceeding to trial.

■ On the other hand, Defendant Jones' pro se brief challenges the district court's upward departure pursuant to Guideline § 5K2.8, and we conclude that the significant four level upward departure was not reasonable.

The district court's Judgment provides the following reasons for departing upward:

This case is similar to that of John Riordan which upheld upward departure. The two level enhancement under U.S.S.G. 2F1.1(b)(2)(B) for a scheme to defraud more than one victim fails to adequately take into account this case where there was at least 98 victims. The number of victims is an aggravating circumstance not adequately considered by the Sentencing Commission. 18 U.S.C. section 3553(b). Further, the monetary loss caused by the defendant does not fully capture the psychological, [sic] and this harm done by the defendant to older people.

The public is in need of special protection from the defendant.

J.A. at 153–54 (citation omitted).

After examining the presentence report and the transcript of Jones' sentencing hearing, this Court concludes that the reasons provided by the district court for departing upward—that Jones used a friendly demeanor resulting in psychological harm to his victims, and the number of victims (99)—do not support the four level upward departure.

**(1) Sentencing Guideline 5K2.8: Extreme Conduct.**

Guideline Section 5K2.8 states:

If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

At sentencing, the district court recognized that Jones' conduct was indeed different from that of co-defendant Davis or that of John Riordan, discussed *supra* p. 623, because Jones was "on the surface 'nice' to his victims. He didn't threaten them or berate them at least." J.A. at 640.

The district court, in sentencing co-defendant Davis, and in sentencing telemarketer Riordan on a previous occasion, had determined that threatening or berating individuals constituted a legitimate basis for a significant upward departure under U.S.S.G. § 5K2.8. This Court concurs in that reasoning when such conduct occurs, which was the basis for our refusal to find unreasonable the district court's upward departure in sentencing co-defendant Davis.

However, in the instant case, there was no evidence that Defendant Jones had engaged in extreme conduct under § 5K2.8. Indeed, the district court acknowledged that all of the evidence established that Defendant Jones was a nice person and had acted in a friendly manner in his telemarketing. Nor did the prosecutor contend otherwise:

A.U.S.A. Liebes: Although Mr. Jones may have been using natural personality, he used it to defraud these people. It is not whether it's a put-on or not. It's not friendly to defraud people. It is not friendly to be nice to them and then entice them to send money....

J.A. at 621.

The district court acted to bring Defendant Jones under § 5K2.8 by stating that being nice was in "some ways even more insidious than what Mr. Davis and Riordan did. He really wasn't being nice, just deceptive. The result is the same—fraud." J.A. at 640. The district court's conclusion that since "fraud" resulted from the conduct of Messrs. Davis, Riordan, and Jones, they had all en-

gaged in "extreme conduct," is not valid. Indeed, had Defendant Jones not engaged in fraud, he would not have been prosecuted/convicted. Thus, the district court's conclusion that Jones had engaged in fraud, as had Davis and Riordan, does not *ipso facto* support an upward departure under the guidelines.[6] The focus must be on Defendant Jones' specific conduct, and whether that conduct amounts to Extreme Conduct under guideline 5K2.8.

■■■ This Court has previously set forth in *Hill* the following guide for us to follow in evaluating whether the facts concerning Jones' conduct warrant the application of Guideline § 5K2.8:

"[W]hether the facts found by the district court warrant the application of a particular guideline provision is a legal question and is to be reviewed de novo by the appellate court." *United States v. Partington,* 21 F.3d 714, 717 (6th Cir.1994).

*Hill* at 1481. Here, the district court stated that it was departing upward under guideline 5K2.8 because:

This defendant attempted to get money from people when he knew they were either sick, destitute or both. The Court finds this is extreme conduct warranting a departure under Section 5K2.8 of the Sentencing Guidelines.

J.A. at 641–42.

The record does not support this conclusion. There was evidence that Mr. Jones did not talk to people about their illnesses. Thor Andrews, a co-defendant who pled guilty and testified as a government witness pursuant to a plea agreement, was asked whether he ever heard Jones talk to people about their illnesses. His answer was: "No, sir, I didn't." J.A. at 223.

There was, however, significant evidence that Defendant Jones had acted in a "nice" manner toward those he spoke with. Jones' presentence report stated in paragraph 24:

The investigation revealed that Jones used friendship as a mode of communicating

with the victims. There is no evidence that he ever threatened any victims.

J.A. at 75.

The district court noted at the sentencing hearing:

Well, Mr. Jones may or may not be naturally friendly, I don't have any reason to believe that he's not in the sense that he's amicable and in the sense that he was not abusive overtly in his telephone calls to the victims. But Mr. Jones used his "friendliness" to his advantage to ingratiate himself with the people that he was calling about the method and means by which to obtain money from them and gain their trust. And it was absolutely clear from the telephone calls and the testimony that we heard in this case.

J.A. at 622.

The district court's statement confirms the testimony, the presentence report, and the prosecution acknowledgment—that Defendant Jones was friendly and not abusive to his victims. Accordingly, this Court concludes that the facts of this case are not similar to Riordan or Davis.

In reviewing, *de novo,* the district court's application of U.S.S.G. § 5K2.8, Extreme Conduct, to Jones' conduct, we conclude that the district court erred in applying § 5K2.8 to Jones' conduct. Jones conduct cannot be brought under the guideline definition of "extreme conduct," to wit, evidencing behavior "unusually heinous, cruel, brutal or degrading to the victim."

Accordingly, this Court holds that the district court erred in utilizing guideline 5K2.8, Extreme Conduct, as a basis for an upward departure in sentencing Defendant Jones.

**(2) The Number of Victims**

■■■ As another ground for departing upward, the district court stated:

[T]he sentencing guidelines do not take into account the situation where, as here, the defendant defrauded this many [99]

---

6. Further evidence that the district court improperly sentenced Jones in *pari materia* with Davis and Riordan is contained in Jones Judgment, where the district court utilized the identical departure language to that contained in Davis' Judgment. Compare J.A. at 136–37 (Davis) with J.A. at 153–54 (Jones). The language contained in the Judgments is set forth in footnote 4, *supra.*

victims. Thus telemarketing was the defendant's livelihood, it was not just a one time thing. The guidelines do not count for that.... This is an aggravating circumstance that was not adequately considered by the Sentencing Commission.

J.A. at 641.

While the number of victims may in some cases provide a valid basis for an upward departure, this Court concludes that, given our rejection of the district court's application of § 5K2.8 to Defendant Jones, the district court's upward departure of four levels, now supported solely on the number of victims, was not reasonable under Sixth Circuit precedent.

▮ As we stated in *Brown*, we review for an abuse of discretion a district court's decision to depart upward.[7] *Brown*, 147 F.3d at 486. In *Brown*, the reasons provided by the district court—indeed, the instant district court—for departing upward *two levels* included, *inter alia*, "the number of victims, 336, because U.S.S.G. § 2F1.1(b)(2)(B) does not adequately take into account such a large number of victims." *Brown*, 147 F.3d at 486. In the instant case, the number of victims tied to Jones is 99, fewer than one-third of the number in *Brown*.[8]

This Court is fully aware that the message of the Supreme Court in *Koon* was that the role of an appellate court is not to micromanage the sentencing decisions of district courts. At the same time, as this Court recognized in *Crouse*, the Court of Appeals retains a role in preventing unreasonable

departures, upward or downward, which are not supported by evidence. In *Crouse*, this Court held that the extent of the district court's downward departure was unreasonable; the district court "stated that he was departing downward 6 levels to reach a sentencing range that would allow a 12–month sentence." *Crouse*, 145 F.3d at 787, n. 2.[9]

In *Crouse*, citing *Koon*, this Court pointed out that we review a district court's decision to depart from the Guidelines for an abuse of discretion: "[T]his Court reviews any sentence that is 'outside the applicable guideline range' for reasonableness." *Crouse*, 145 F.3d at 789 (citations omitted).[10]

This Court in *Crouse*, noted that the Supreme Court's reasoning in *Williams v. United States*, 503 U.S. 193, 203–04, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992), applied to a situation where a district court, as here, advances multiple reasons for a departure:

A sentence thus can be "reasonable" even if some of the reasons given by the district court to justify the departure from the presumptive guideline range are invalid, provided that the remaining reasons are sufficient to justify the magnitude of the departure.

*Crouse*, 145 F.3d at 789. In the instant case, the district court advanced two principal grounds for departing upward four levels in sentencing Defendant Jones'—U.S.S.G. § 5K2.8, Extreme Conduct, and the number of victims. This Court has concluded Defendant Jones' conduct does not amount to Ex-

---

7. More recently, in *Koeberlein*, 161 F.3d at 952, this Court stated: "We review a decision to depart for abuse of discretion. *Koon v. United States*, 518 U.S. 81, 82, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)."

8. In *United States v. Benskin*, 926 F.2d 562 (6th Cir.1991), this Court upheld a departure from a guideline range of 27–33 months (offense level 18; criminal history category I) to 60 months, in a mail and securities fraud conviction involving more than 600 investors and $3.8 million dollars. In the instant case, there is no comparison in either the number of investors or the monetary loss involved.

9. Indeed, this Court viewed the *Crouse* district court's downward departure as "13 levels to a Guideline range that would allow a sentence of

home confinement in place of imprisonment." *Crouse*, 145 F.3d at 787. We explained:

The district judge stated that he was departing downward 6 levels to reach a sentencing range that would allow a 12–month sentence. However, this Court viewed the departure as an even greater one "because the guidelines do not allow home confinement as a prison substitute for offenses level 13. For a defendant with a criminal history category of I, home confinement would only have been a substitute for an offense level of 6 or less."

*Id.* at n. 2. (citations omitted).

10. In *United States v. Barajas–Nunez*, 91 F.3d 826, 831 (6th Cir.1996), this Court stated that "the *Koon* Court's abuse of discretion standard replaces the three-part standard of review [previously] adopted by this court."

treme Conduct under § 5K2.8. Therefore under *Williams, supra,* the remaining issue is whether the district court's four level upward departure is reasonable based upon the district court's remaining reason—the number of victims.[11]

In *Crouse,* this Court held that the district court's significant downward departure was not supported by the record. In the instant case, this Court holds that the four level upward departure against Jones based on the number of victims is not reasonable under the facts of this case.[12]

Accordingly, this Court REMANDS for resentencing of Defendant Jones that limits any upward departure to two levels.

### IV.

Accordingly, for the above reasons, this Court:

(1) AFFIRMS the Conviction of Davis;

(2) AFFIRMS the Sentence of Davis;

(3) AFFIRMS the Conviction of Jones; and

(4) REVERSES the Sentence of Jones, and REMANDS for resentencing of Jones consistent with this Opinion.

---

11. Jones' presentence report, adopted by the district court, had already added 2 offense levels under Guideline § 2F1.1(b)(2) because the offense involved more than unusual planning or a scheme to defraud more than one victim, and 2 more offense levels under Guideline § 3A1.1(b) for vulnerable victims.

12. This Court further notes that Jones was not employed as, a "reloader," as was co-Defendant Davis. Jones' presentence report, in listing the categories of employees at International Health, stated that reloaders are the most culpable. J.A. at 74.